KITCHENS, Justice,
for the Court:

ON MOTION FOR REHEARING

¶ 1. The motion for rehearing is granted. The original opinions are withdrawn, and these opinions are substituted therefor.
¶ 2. An underground culvert system failed and caused a large sinkhole behind the Carraway residence. The culvert system drains Eastover Lake, which is owned by the surrounding property owners (collectively, “the Lake Owner Defendants”) and maintained by the Eastover Lake Association (ELA). On October 9, 2006, T.L. Carraway Jr.[1] filed suit against the Lake Owner Defendants and ELA. The Lake Owner Defendants and ELA filed third-party complaints for indemnity against the City of Jackson, alleging that the City’s sewer-line repairs had caused the sinkhole. The chancellor found the Lake Owner Defendants, ELA, and the City jointly and severally liable for the repair. The Lake Owner Defendants, ELA, and the City appeal.
¶ 3. We affirm in part, finding that the issues raised by the Lake Owner Defendants, the ELA, and the City are without merit, except that the chancellor erred by ordering joint and several liability. We reverse and render, finding that the Lake Owner Defendants, ELA, and the City are severally liable for the costs of the repairs of the culvert and sinkhole in proportion to their respective allocations of fault as determined by the chancery court.

FACTS

A. Eastover Lake

¶ 4. The Carraway property lies within Eastover Subdivision, which was developed by Eastover Corporation between 1949 and 1962. Eastover Lake was constructed as a part of the development. The lake was formed by building an earthen dam to contain runoff water. The Lake Owner Defendants own lots abutting the lake. Lake Circle Drive lies south of the lake, and the Carraway property lies south of Lake Circle Drive across from the lake. *577 ELA is a homeowner’s association that maintains the lake.[2]
¶ 5. Eastover Lake is drained by a concrete spillway that is connected to an underground culvert system. The spillway collects the overflow water from the lake and the culvert system and drains it to Pearl River.[3] The culvert system is 250 feet long and consists of fifty-three sections of interlocking concrete pipe sloping down toward Pearl River. The culvert system begins at the spillway at the southeastern corner of the lake, runs under Lake Circle Drive, then runs beside the Carraways’ eastern property line, and then empties the water out behind the Carra-way property. The water then flows through a swampy area down to the Pearl River. Ownership of the culvert system was disputed at the trial.
¶ 6. The chancellor found that, in 1962, Eastover Corporation dedicated streets, rights of way, and easements to the City by plat map. The plat map shows a ten-foot utility easement between Lots 19 and 20,[4] but it does not show the lake and culvert system, indicating that they remained the property of Eastover Corporation. In 1978, ELA was incorporated for the purpose of accepting a flowage easement from the developer for the “inundation, ownership, control, operation and maintenance” of Eastover Lake. Subsequently, Eastover Development, Incorporated, the successor of Eastover Corporation, conveyed and quitclaimed ownership of Eastover Lake, the dam, spillway, and any related easements. Eastover Development conveyed fee simple title to the lake to the abutting property owners. After this conveyance, each lake owner’s lot line extended to the middle of the lake. Along with this conveyance of the lake, a flowage easement was conveyed to ELA for the inundation, ownership, control, operation, and maintenance of the lake. Additionally, a perpetual drainage-ditch easement was conveyed to the Lake Owner Defendants and “all others” having a natural easement to the flow of the surface waters of the lake.[5]
¶ 7. A former president of ELA, Steve Rogers, testified that the lake is private and is protected by restrictive covenants, and that the purpose of the culvert system is to drain the lake so it does not overflow onto surrounding properties. He testified that the culvert system has been in use since Eastover Lake was constructed. Rogers testified that ELA cleaned the lake and maintained liability insurance that covered property damage associated with the premises, including the “concrete and steel spillway.” Rogers wrote periodic letters to ELA members about dues and to apprise them of matters involving the lake. On January 8, 2002, he wrote a letter stating “we need to take certain actions each year. Specifically, we need to clean the lake, repair the dam and spillway, and remove (kill) beavers periodically.”

*578
B. The Sinkhole

¶ 8. In the late 1990s, Kirk Carraway, a relative of T.L. Carraway and a local contractor, inspected the Carraway property while planning the construction of an addition to the house. Kirk Carraway noticed severe erosion problems around the outlet end of the culvert pipe where the water exited the pipe and flowed down toward the Pearl River. He told the Carraways of the problem.
¶ 9. In 2002, the City repaired a sanitary sewer line adjacent to Lake Circle Drive. In the process, City employees dug up and removed several sections of the culvert pipe to access the sewer line, which lay approximately six feet beneath the culvert pipe. The City workers did not obtain permission to remove the sections of culvert pipe, even though they knew it was part of the drainage system for the lake. They also failed to consult anyone about proper instructions for replacing the pipe.[6]
¶ 10. Sylvia Carraway testified that, in April 2004, she discovered a sinkhole in her back yard. Sylvia testified that the sinkhole was about ten to twelve feet long and two feet deep. Sylvia contacted the City about the sinkhole, believing that the City’s work had caused the problem, but the City did not provide any relief. In June 2004, Sylvia approached Rogers, then the president of ELA, about the sinkhole, but ELA provided no relief.
¶ 11. Rogers testified that, in 2004, he had suspected the lake was leaking. On June 11, 2004, Rogers wrote the lake owners, stating: “We continue to monitor the lake level to determine if we have a subsurface leak at the spillway. Sylvia Carra-way has a good bit of damage in her backyard from the lake overflow that appears to have spilled from a pipe break. This does not appear to be our challenge ... there was some damage to the pipe when the city dug up the street a year ago.” On October 6, 2004, Rogers wrote the following: “The lake has dropped about 8 inches during the recent drought so it is hard to tell if the leak in the dam is the culprit or just simple evaporation.... We may have to repair this next summer but in the meantime we will monitor the cracks, leaks and the water level.” Rogers testified that, after obtaining an engineering report, he had concluded that the lake’s unusually low level was due to drought. However, the engineer who performed the inspection stated in a January 2005 letter that seepage “is probably occurring around one or both ends of the spillway abutments.”
¶ 12. Carraway’s complaint, filed on October 9, 2006, alleged that the Lake Owner Defendants and ELA are responsible for maintaining the culvert system, but they negligently failed to do so, causing the sinkhole to form in the Carraways’ yard. The complaint alleged that the Lake .Owner Defendants and ELA were liable for repairing the damage to the Carraway property. In October 2007, the Lake Owner Defendants and ELA filed third-party complaints for indemnity against the City, alleging that the City had damaged the culvert system when it had repaired the sewer line in 2002, which had led to the failure of the culvert system and to the sinkhole. The complaint against the City included a general prayer for “any relief as this court may deem appropriate.” The City denied liability and asserted immunity and other defenses under the Mississippi Tort Claims Act (MTCA).
*579 ¶ 13. At trial, Sylvia testified that the sinkhole has grown, and that it is now fifty feet long, twenty-five to thirty feet wide, and between fifteen and twenty feet deep. She stated that it is located directly above the underground culvert pipe, near the outlet. She stated that the culvert system has not been replaced or maintained since she moved in.

C. Expert testimony

¶ 14. Soil borings taken near several sections of the culvert pipe established the presence of Yazoo clay beneath the culvert system. The expert testimony was in agreement that leaks in the culvert system had caused escaping water to contact the Yazoo clay, which had resulted in earth movement which caused further damage to the culvert pipe, causing the sinkhole. But the expert testimony conflicted as to how the initial leaks had occurred.
¶ 15. Carraway’s expert, Alain J. Gallet, testified that the culvert pipe was in a very poor state of repair, and that many sections had joint separations that had leaked and caused the sinkhole. His geotechnical exploration report showed separation between joints 1 and 2, 10 and 11, 11 and 12, 12 and 13, 13 and 14, 17 and 18, 21 and 22, and a total misalignment of joints 49 through 53, with water flowing everywhere. He testified that the sinkhole is located over joints 50 through 53. He also testified that cracks at the inlet head wall and apron contributed to the sinkhole.
¶ 16. The Lake Owner Defendants and ELA attempted to show the City’s sewer-line repair work had caused defects in the culvert system that resulted in the sinkhole. It was established that the City had removed sections 11 through 13 of the culvert pipe to access the sewer line. Charles Furlow, a geotechnical engineer, opined that the City was at fault because it had cut and reinstalled the culvert pipe in an improper manner, causing a leak. Jill Butler, a hydrology and hydraulics expert, testified that improper soil compaction during the city’s repair had caused settling, which had caused the culvert pipe to leak. Then, in a process known as “water piping,” water began flowing down the outside of the culvert pipe, taking soil with it, which created an underground void downstream of the leak, eventually collapsing and forming the sinkhole.
¶ 17. Colvin D. Mann, a civil engineer, testified on behalf of the City that not all the water came from the City’s repair. He testified that the outlet of the culvert pipe, which consisted of a head wall and an apron, was in disrepair. He testified that encroaching tree roots had caused the outlet head wall to move, causing sections 51 through 53 of the pipe to become disjointed. Mann opined that this had caused water leakage, which in turn had caused the sinkhole to form above those joints.

D. Chancellor’s findings

¶ 18. The chancellor found that, because the elements of an easement by necessity were met, the Lake Owner Defendants and ELA had an easement by necessity along the culvert system. The chancellor found that the easement arose when Eastover Corporation subdivided the property and built the lake, dam, and culvert system, and since that time, the use has been “continuous, apparent, and permanent.” In 1962, Eastover Corporation dedicated streets, rights of way, and easements to the City, but retained the lake, dam, and culvert system. In 1978, East-over Development, Incorporated, the successor to Eastover Corporation, conveyed the lake to the abutting property owners “by extending the present boundary lines of said abutting lots to the center line of the perpetual ditch easement in said lake.... ” In 1978, ELA was formed for the purpose of accepting a flowage easement to maintain the lake level. Accordingly, ELA was reserved, conveyed, and *580 quitclaimed a flowage easement for “the inundation, ownership, control, operation and maintenance of said lake.” The chancellor found the culvert system is necessary to prevent the lake from flooding.
¶ 19. The chancellor found that the Lake Owner Defendants and ELA owe a duty of reasonable care in the repair and maintenance of the easement. The chancellor held that the numerous letters from Rogers to ELA members about maintenance and repair of the lake, dam, and spillway confirmed that the Lake Owner Defendants and ELA had acknowledged their duty of maintenance and repair.
¶ 20. The chancellor found that the inlet of the culvert system was in extreme disrepair. The chancellor was “convinced that the sinkhole on the Subject Property had started to form initially as a result” of a breach of the duty of care by the Lake Owner Defendants and ELA, and had worsened after the City’s work. The chancellor cited the testimony of Butler that water piping causes escaping water to move soil and run down the pipe. The chancellor also cited Gallet’s testimony that the cracks in the head wall and apron at the inlet section of the culvert system had contributed to the sinkhole. The chancellor concluded that long-term soil erosion had occurred under the culvert pipe for an extended period of time, and that the City’s negligent repair work, coupled with the Lake Owner Defendants’ and ELA’s failure to maintain and repair the culvert system, had caused the sinkhole.
¶ 21. The chancellor also found that the Lake Owner Defendants and ELA were barred from asserting an indemnity claim against the City, as the Lake Owner Defendants and ELA themselves were liable, since they actively had participated in the wrongdoing. Additionally, the court found that the Lake Owner Defendants and the City were jointly and severally liable for the damage caused by the sinkhole, and ordered them immediately to repair the culvert system and eliminate the erosion. The chancellor found that the City was liable for forty percent of the repair costs, the Lake Owner Defendants were liable for thirty percent of the repair costs, and ELA was liable for the remaining thirty percent. The chancellor also ordered all defendants to replace the lost soil and vegetation and found the City liable for forty percent of those costs, the Lake Owner Defendants liable for thirty percent, and ELA liable for thirty percent. The chancellor based these proportions of liability on the length of time the erosion had been occurring, on the City’s negligent work performance on the culvert pipe in 2002, and on the Lake Owner Defendants’ failure to maintain the culvert system, all of which the court found had combined and resulted in the damage to the Carraway property. The chancellor further ordered the Lake Owner Defendants and ELA to maintain the culvert system to prevent future harm to the Carraway property.

STANDARD OF REVIEW

¶ 22. This Court will disturb a chancellor’s findings only if those findings were manifestly wrong, clearly erroneous, or unsupported by substantial evidence, or if the chancellor abused her discretion or applied an erroneous legal standard. Long Meadow Homeowners’ Ass’n, Inc. v. Harland, 89 So.3d 573, 577 (Miss.2012) (quoting Sanderson v. Sanderson, 824 So.2d 623, 625-26 (Miss.2002)). We review all questions of law de novo. Id.

ANALYSIS

I. Issues raised by the Lake Owner Defendants and joined by ELA

A. WHETHER THE LAWSUIT IS BARRED BY THE STATUTE OF LIMITATIONS.
¶ 23. The Lake Owner Defendants argue that the three-year statute of limita *581 tions had expired when T.L. Carraway Jr. filed the complaint on October 9, 2006. The chancellor found that the complaint was timely filed. The chancellor applied the discovery rule, which provides that “[i]n actions for which no other period of limitation is prescribed and which involve latent injury or disease, the cause of action does not accrue until the plaintiff has discovered, or by reasonable diligence should have discovered, the injury.” Miss.Code Ann. § 15-1-49(2) (Rev.2003). The evidence was that, in the 1990s, there was some erosion at the outlet end of the culvert system, and that in either 2002 or 2004, the Carraways discovered a sinkhole located in their back yard directly over the underground culvert system. There was no evidence of when the sinkhole had formed.
¶ 24. The Lake Owner Defendants argue that the chancellor should not have applied the discovery rule to determine the commencement of the statute of limitations. Yet, they put forth no argument as to why the discovery rule does not apply. Instead, they implicitly recognize that this case involves a latent injury, because their arguments focus on when the Carraways “knew or should have known” of the injury. Because the parties agree that the cause of action accrued when the Carra-ways knew or should have known of the injury, we focus on that question.
¶ 25. The Lake Owner Defendants argue that the Carraways knew or should have known of the injury in the 1990s, when Kirk Carraway notified them of erosion at the outlet end of the culvert system, and that the latest the Carraways knew or should have known of the injury was in 2002, when Sylvia discussed a problem in her back yard with City workers. Kirk Carraway testified that he had notified the Carraways of erosion in the 1990s. However, he testified that this erosion was at the outlet end of the culvert pipe at the location where water flowed out of the culvert pipe down to the Pearl River. As Justice Chandler correctly notes, this erosion was at a different location than the sinkhole, which formed over the underground culvert pipe. Because erosion at a different location was not sufficient to have placed the Carraways on notice of the impending sinkhole, the chancellor did not manifestly err by rejecting the Lake Owner Defendants’ claim that the Carraways knew or by reasonable diligence should have known of the injury in the 1990s.
¶ 26. Sylvia testified that she had discovered the sinkhole in April 2004, when her decorator, Joe Rankin, had inspected her back yard in anticipation of constructing a gazebo. Rankin discovered the sinkhole and showed it to Sylvia. Later in 2004, Sylvia contacted the City and ELA in an effort to obtain relief. Sylvia’s testimony conflicted with that of Ronald Hop-son, who supervised the 2002 city sewer-line repair project. Hopson testified that, during the project, Sylvia had shown him a “sinkhole or cave-in” in her back yard.
¶ 27. It was the role of the chancellor to observe the demeanor of the witnesses, weigh the conflicting testimony, and make a determination from the credible evidence as to when Sylvia discovered the injury. Mabus v. Mabus, 890 So.2d 806, 820-21 (Miss.2003). The chancellor found that Sylvia had “learned of the sinkhole” in April 2004 from her decorator, who had discovered it in the back yard and had shown it to Sylvia. While addressing the Lake Owner Defendants’ argument that the Carraways had known of the injury in 2002, the chancellor stated that the limitations period had not begun in 2002 because “at the time Sylvia noticed the sinkhole in the summer of 2002, she had at that time no true and real knowledge of the origin or causation of the sinkhole.” *582 The chancellor found that, because water flow and flood currents require expert knowledge to comprehend fully, a layperson could not have perceived the injury at the time of the wrongful act. But the chancellor further held that “even if it is presumed that Mrs. Carraway discovered the sinkhole in June of 2002,” the continuing tort doctrine applied, because the defendants were guilty of repeated acts of wrongful conduct. The chancellor further found that Sylvia had shown Davis and Hopson “erosion over the outlet of the culvert system” in 2002.
¶ 28. The Lake Owner Defendants argue that the chancellor found that the Carraways had known of the sinkhole in 2002 and contend that the chancellor erroneously found that the limitations period did not begin until the Carraways knew of the sinkhole’s cause. Carraway argues that the chancellor found the Carraways had discovered the sinkhole in 2004. When faced with an ambiguous judgment, we turn to the rules of construction. Wilson v. Freeland, 773 So.2d 305, 308 (Miss.2000). “A judgment decree or opinion of court is a legal text, and, when questions of meaning arise, answers are sought by ‘the same rules of construction which appertain to other legal documents.’ ” Estate of Stamper, 607 So.2d 1141, 1145 (Miss.1992) (quoting Gillum v. Gillum, 230 Miss. 246, 255, 92 So.2d 665, 668 (1957)). “[D]ecrees will be construed as a whole, and in doing so ... effect must be given to all [the decree’s] recitals and with the prime object to ascertain the intention that selected the words used therein.” Rayl v. Thurman, 156 Miss. 8, 125 So. 912, 914 (1930). Our focus is on determining the intent of the chancellor. Stribling v. Striding, 960 So.2d 556, 561 (Miss.Ct.App.2007).
¶ 29. Justice Coleman argues that the chancellor acknowledged that Sylvia learned of the sinkhole in 2002 and applied the incorrect legal standard in determining that the statute of limitations began to run only when she learned of the cause of the sinkhole in 2004. We disagree. Initially, it must be stated that this issue was argued and adjudicated in this Court’s previous opinion. “The motion for rehearing should be used to call attention to specific errors of law or fact which the opinion is thought to contain; the motion for rehearing is not intended to afford an opportunity for a mere repetition of the argument already considered by the court.” M.R.A.P. 40(a) (emphasis added). This issue has been decided by this Court, and the ELA and Lake Owner Defendants did not raise it in their motion for rehearing. Accordingly, it is not properly before this Court, and we should not sua sponte address the issue when it already has been argued and decided. Regardless, the chancellor plainly found that Sylvia had learned of the sinkhole in April 2004. Hopson testified that Sylvia had shown him “a sinkhole or cave in.” Based on the testimony and the facts before her, the chancellor found that, in 2002, Sylvia showed Hopson the erosion near the outlet of the culvert system. In so finding, the chancellor partially rejected Hopson’s testimony that he was shown the sinkhole in 2002 and determined that Sylvia actually had discovered the sinkhole in 2004. Later, the chancellor stated Sylvia had noticed the sinkhole in 2002, and that, “even if it is presumed that Mrs. Carraway discovered the sinkhole in June 2002,” the claim was not time-barred. These statements indicated the chancellor presumed only for the sake of argument that Sylvia had discovered the sinkhole in 2002. All discussion of Sylvia’s 2002 discovery was in the context of refuting the Lake Owner Defendants’ arguments. Considered in light of the chancellor’s earlier finding that Sylvia had learned of the sinkhole in 2004, *583 we find the chancellor’s conclusions that the complaint was timely even if Sylvia had discovered the sinkhole in 2002, and on the continuing tort doctrine, were intended to be alternative holdings. Because the chancellor found that Sylvia first had learned of the sinkhole in April 2004, the chancellor did not manifestly err in finding that the complaint was timely filed under the discovery rule. Furthermore, the chancellor did not apply the incorrect legal standard because she found, based on the facts presented, that the injury was discovered in 2004. Such a factual determination by a chancellor is reviewed for manifest error, and we find none here. The chancellor applied the correct legal standard for determining when the clock started running on the Carraway’s claims, and we cannot say the chancellor abused her discretion or that her determination was manifestly erroneous. We do not address the chancellor’s alternative holding on the continuing tort doctrine.
B. WHETHER THE OVERFLOW CULVERT SYSTEM HAS BEEN ACCEPTED BY THE CITY, TAKEN BY THE CITY, OR IS OTHERWISE THE CITY’S TO MAINTAIN AND REPAIR.
¶ 30. The Lake Owner Defendants and ELA argue that they do not own the culvert system because it was dedicated to and accepted by the City by a plat. In 1962, the City accepted and approved a plat showing a ten-foot utility easement between the Carraways’ lot, which is Lot 19 and Lot 20. The chancellor found that the plat had dedicated the ten-foot utility easement to the City. However, the plat did not show the lake and culvert system. This Court has held that “[i]t is well-settled law in Mississippi that land sold according to a plat or map will dedicate the streets, alleys, squares, and other public ways marked on the map or plat to the public for public use.” Nettleton Church of Christ v. Conwill, 707 So.2d 1075, 1076 (Miss.1997) (emphasis added). The culvert system was not marked on the plat, and it never was dedicated to the City for public use.
¶ 31. Alternatively, the Lake Owner Defendants contest the chancellor’s finding that the City had not effected a taking of any portion of the culvert system. The constitutions of the United States and Mississippi restrict the government’s eminent-domain power. U.S. Const, amend. V; U.S. Const, amend. XIV; Miss. Const, art. 3, § 17. The Fifth Amendment to the United States Constitution states that “[n]o person shall be ... deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.” U.S. Const, amend. V. Article 3, Section 17 of the Mississippi Constitution of 1890 provides:
Private property shall not be taken or damaged for public use, except on due compensation being first made to the owner or owners thereof, in a manner to be prescribed by law; and whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be public shall be a judicial question, and, as such, determined without regard to legislative assertion that the use is public.
Miss. Const, art. 3, § 17 (1890).
¶ 32. The Lake Owner Defendants argue that, even if they own the culvert system, the City effected a regulatory taking of the culvert system by enacting an ordinance that prohibits private individuals such as the Lake Owner Defendants from cutting through city streets to construct or connect sewers. They argue that these ordinances prevent them from repairing *584 the culvert system. Alternatively, the Lake Owner Defendants argue that the City accomplished a physical taking of their culvert system by damaging it during the sewer-line repair.
¶ 38. The City argues that these “takings” arguments are procedurally barred because they were not raised in the third-party complaints filed by the Lake Owner Defendants and ELA. The third-party complaints filed by the Lake Owner Defendants and ELA request the remedy of indemnity against the City of Jackson. Except for the third-party complaints filed by Grace P. Lee and Sidney S. Lee, Lee Lott Jr. and Nina D. Lott, and ELA,[7] each third-party complaint asserts a takings argument in support of the indemnity claim. But these takings arguments do not assert that the Lake Owner Defendants own the culvert system, that the City effected a taking of the Lake Owner Defendants’ property, or that the Lake Owner Defendants are entitled to just compensation for a taking of the culvert system. Rather, they assert that the City effected a taking of the Carraway property by causing Carr-away to suffer economic loss from the sinkhole, entitling Carraway to just compensation. The. Lake Owner Defendants never raised a separate claim that the City had committed an unconstitutional taking by damaging the Lake Owner Defendants’ property. They asserted a takings argument only as a basis for their indemnity claim. Because the Lake Owner Defendants did not plead the takings claims they now raise on appeal, these claims are procedurally barred. McKee v. Bowers Window & Door Co., Inc., 64 So.3d 926, 940-41 (Miss.2011).
C. WHETHER AN EASEMENT BY NECESSITY EXISTS OR CAN BE EQUITABLY IMPOSED.
¶ 34. The chancellor found that the Lake Owner Defendants and ELA had an implied easement by necessity along the culvert system, described as the 250-foot long, ten-foot-wide culvert pipe. An easement by necessity requires proof that (1) the easement is necessary; (2) the dominant and servient estates were once part of a commonly owned parcel; (3) the implicit right-of-way arose at the time of severance from the common owner. Leaf River Forest Prods., Inc. v. Rowell, 819 So.2d 1281, 1284 (Miss.Ct.App.2002). “[A]n easement by necessity arises by implied grant when a part of a commonly-owned tract of land is severed in such a way that either portion of the property has been rendered inaccessible except by passing over the other portion or by trespassing on the lands of another.” Taylor v. Hays, 551 So.2d 906, 908 (Miss.1989). “An easement by necessity requires no written conveyance because it is a vested right for successive holders of the dominant tenement and remains binding on successive holders of the servient tenement.” Dieck v. Landry, 796 So.2d 1004, 1008 (Miss.2001).
¶ 35. The Lake Owner Defendants agree with the chancellor’s findings that Eastover subdivision and Eastover Lake were developed simultaneously, that the culvert system continuously has carried overflow water from the lake, and that the culvert system is necessary to prevent flooding. But, they argue, no easement by necessity exists, because the City accepted the dedication of the culvert system. They cite the rule that “if a public way is laid out which affords access to the premises, *585 ... the right of way of necessity ceases.” Thornton v. McLeary, 161 Miss. 697, 137 So. 785, 786-87 (1931). Because, as discussed above, the chancellor committed no error in finding that the plat did not dedicate the culvert system to the City, this issue is without merit.
¶ 36. The Lake Owner Defendants also argue that the chancellor manifestly erred by finding that they owned an easement by necessity, because the culvert system benefits other properties besides those of the Lake Owner Defendants. Testimony was presented that the culvert system benefits the Carraway property and some 200 acres in a watershed that drains into the lake, and without the lake and culvert system, these areas would flood. In support of this argument, the Lake Owner Defendants point to the 1978 deed conveying a perpetual ditch easement in the lake to the owners of properties abutting the lake and “all others.”[8]
¶37. In considering these arguments, the chancellor stated:
The language “all others” connotes a definition that includes all others having a natural easement for the flow of surface waters into Eastover Lake. However, the issues brought forth in this case are much more limited than “all others.” The area in which Mrs. Carraway’s property sits, means that the water from “all others” flows downstream towards and through the culvert system on Mrs. Carraway’s property. However, the Lake Owner Defendants and [ELA] are distinct and different regarding the claims in this case. The distinction is this: the Lake Owner Defendants own the property upon which Eastover Lake sits and [ELA] controls, operates, and maintains Eastover Lake. The “all others” described above do not own, control, operate, or maintain the culvert system. Therefore, the “all others” is separate and apart from this matter.
¶ 38. We find that, despite the fact that the lake collects water from some 200 properties in the watershed, the chancellor did not clearly err by finding that the Lake Owner Defendants have an easement by necessity in the culvert system that drains the lake. Only the Lake Owner Defendants own the lake. Once the water drains into the lake, it becomes their property. But for the culvert system removing water from their lake, the Lake Owner Defendants’ properties would be flooded by their own lake. The culvert system does not benefit the other landowners in the watershed, because water from their properties would drain down to the Pearl River regardless of the presence of the lake and culvert system. Further, the fact that a deed conveyed a perpetual ditch easement in the lake to “all others” is irrelevant to the finding of an implied *586 easement in the culvert system. The chancellor did not manifestly err by finding that the Lake Owner Defendants have an easement by necessity along the culvert system.
¶ 39. This Court has recognized that a party may have an implied easement for the purpose of drainage. Dethlefs v. Beau Matson Dev. Corp., 511 So.2d 112, 115-16 (Miss.1987). The culvert system was necessary to drain the lake. The culvert system was installed by the Eastover Corporation, a predecessor in title to the Lake Owner Defendants. The culvert system has been apparent and continuously used to drain the lake since the time of the severance from the common owner. The elements of an easement by necessity were met. Taylor v. Hays, 551 So.2d 906, 908 (Miss.1989). Under the specific facts of this case, the chancellor did not manifestly err by finding that the Lake Owner Defendants have an easement by necessity.
D. WHETHER THE CHANCELLOR’S ORDER IS IMPOSSIBLE TO PERFORM, UNCONSTITUTIONAL, AND/OR IS OTHERWISE UNENFORCEABLE.

1. Impossibility

¶ 40. The chancellor found that the order of the court was not impossible to perform, nor was it a measure of involuntary servitude. The Lake Owner Defendants argue that the order for them to “immediately repair the culvert system and to eliminate the erosion” is impossible to perform and unenforceable. They argue that the repair is impossible due to Article IV, Section 110-131, of the City of Jackson Code of Ordinances. Section 110-131 provides that “[n]o permit will be granted to any person for any sewer, water, or gas connection, or conduit for wires of any kind where such construction requires cutting through any paved street or concrete sidewalk. Such work shall be done only by the city.” Jackson, Miss., Code art. IV § 110-131 (1971). However, Section 110-19 allows a person to perform work under the surface of a right-of-way or street after obtaining approval from the public works department. Jackson, Miss., Code art. I § 110-19 (1971).
¶ 41. The Lake Owner Defendants cite a case in which this Court reversed a chancellor’s contempt order when a party proved impossibility of performance. Keppner v. Gulf Shores, Inc., 462 So.2d 719, 726 (Miss.1985). But the Lake Owner Defendants have not proven that the culvert system qualifies as a “sewer, water, or gas connection” such that they could not obtain approval for repair work from the public works department. The chancellor did not err by finding that the order was not impossible to perform.

2. Constitutionality

¶ 42. Next, the Lake Owner Defendants argue that the relief granted is unconstitutional under the Thirteenth Amendment. The Thirteenth Amendment states that “[n]either slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction.” U.S. Const, amend XIII. “Involuntary servitude” has been defined as “a condition of servitude in which the victim is forced to work for the defendant by ... the use or threat of coercion through the legal process.” U.S. v. Kozminski, 487 U.S. 931, 952, 108 S.Ct. 2751, 2765, 101 L.Ed.2d 788 (1988).
¶43. The Lake Owner Defendants argue that the chancellor’s order requiring them to repair the culvert system, eliminate erosion, replace the soil and vegetation, and maintain the lake and culvert system in a manner sufficient to prevent further harm to the Carraway property *587 constitutes involuntary servitude. This argument is patently meritless. The chancellor simply ordered the Lake Owner Defendants and ELA to repair and maintain their own culvert system and to resolve the damage caused by their prior mismanagement of their culvert system. The order does not enslave the Lake Owner Defendants by involuntarily placing them in the service of Carraway.

3. Status of the Estate of T.L. Carraway Jr.

¶ 44. The Lake Owner Defendants argue that the chancellor should have dismissed the Estate of T.L. Carra-way Jr. as a plaintiff because the Estate was not a real party in interest. See M.R.C.P. 17(a) (stating that “[ejvery action shall be prosecuted in the name of the real party in interest”). The Lake Owner Defendants contend that the Estate conveyed its interest in the Carraway property to the Trust and that it owns no interest in the Carraway property. The chancellor joined the Trust because, while it appeared the Estate had transferred its interest to the Trust, the validity of that transfer was in question.
¶45. Mississippi Rule of Civil Procedure 25(c) states that “[i]n case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party.” M.R.C.P. 25(c). Rule 25(c) is “wholly permissive,” because “the action may be continued by or against the original party and the judgment will be binding on his successor in interest even though he is not named.” M.R.C.P. 25 cmt. The uncertainty as to the Estate’s continuing interest prompted the chancellor to join the Trust to the Estate’s action rather than substituting the Trust for the Estate. This plainly was permissible under Rule 25(c).
J. Joint and Several Liability
¶ 46. The Lake Owner Defendants also argue that the chancellor erred by imposing joint and several liability upon the Lake Owner Defendants, ELA, and the City. They also complain that the chancellor imposed thirty percent liability on all of them without apportioning liability among the individual property owners. The chancellor found that “the City’s negligent work performance in the summer of 2002, coupled with the Lake Owner Defendants and Defendant Eastover Lake Association’s failure to repair and maintain the lake and culvert system has resulted in damage to the Plaintiffs’ property.” The chancellor concluded that “it is the actions of both the City and the Defendants that ultimately contributed to the current damage to the Plaintiffs’ property.” The chancellor found the City, the Lake Owner Defendants, and ELA jointly and severally liable for the sinkhole, with the City liable for forty percent, the Lake Owner Defendants liable for thirty percent, and ELA liable for thirty percent of the costs to repair the culvert system and eliminate the erosion, and to replace soil and vegetation that had eroded due to the failure of the culvert system.
¶ 47. Under Mississippi Code Section 85-5-7, in most cases, liability for damages caused by multiple parties is to be several, not joint and several. Subsection (2) states, in part:
(2) Except as otherwise provided in subsection (4) of this section, in any civil action based on fault, the liability for damages caused by two (2) or more persons shall be several only, and not joint and several and a joint tort-feasor shall be liable only for the amount of damages allocated to him in direct proportion to his percentage of fault....
*588 Miss.Code Ann. § 85-5-7(2) (Rev.2011). Joint and several liability may be imposed only upon joint tortfeasors who colluded to commit a tortious act. Miss.Code Ann. § 85-5-7(4) (Rev.2011). Subsection (4) states:
(4) Joint and several liability shall be imposed on all who consciously and deliberately pursue a common plan or design to commit a tortious act, or actively take part in it. Any person held jointly and severally liable under this section shall have a right of contribution from his fellow defendants acting in concert.
Miss Code Ann. § 85-5-7(4) (Rev.2011).
¶48. The chancellor did not find that the City, the Lake Owner Defendants, and ELA had colluded to commit a tortious act. Therefore, the imposition of joint and several liability was not permitted under Section 85-5-7(2). We reverse and render judgment, apportioning the liability for the costs of the repairs to the culvert system and the replacement of the soil and vegetation which was eroded due to the failure of the culvert system, severally among the individual tortfeasors in direct proportion to the percentage of fault assigned to each of them by the Hinds County Chancery Court.
E. WHETHER THE CHANCELLOR ERRED BY DENYING DEFENDANTS’ CLAIM FOR INDEMNITY AGAINST THE CITY.
¶ 49. The Lake Owner Defendants and ELA filed indemnity claims against the City, claiming that the City was solely liable for the damage to the Carraway property. Relying on J.B. Hunt Transport, Inc. v. Forrest General Hospital, 34 So.3d 1171 (Miss.2010), the chancellor held that the Lake Owner Defendants and ELA were not entitled to indemnity from the City. J.B. Hunt states that “[wjhen one person is required to pay money which another person in all fairness should pay, then the former may recover indemnity from the latter in the amount which he paid, provided the person making the payment has not conducted himself in a wrongful manner so as to bar his recovery.” Id. at 1173 (quoting Bush v. City of Laurel, 215 So.2d 256, 259-60 (Miss.1968)). J.B. Hunt clarified that, because indemnity is not a “fault-sharing mechanism” for joint tortfeasors, a party who is at fault is not due indemnity. However, J.B. Hunt recognized the narrow exception to this rule when the party claiming indemnity did not actively participate in the wrong, and, at most, was passively negligent. “Passive negligence” is the “failure to do something that should have been done.” Titus v. Williams, 844 So.2d 459, 466 (Miss.2003) (citation omitted). Further:
[ajctive and passive negligence are distinguished as follows: “One is only passively negligent if he merely fails to act in fulfillment of duty of care which law imposes upon him, while one is actively negligent if he participates in some manner in conduct or omission which caused injury.”
Id. (citations omitted).
¶ 50. The chancellor held that, because the Lake Owner Defendants and ELA were guilty of active negligence, they were not entitled to indemnity from the City. The Lake Owner Defendants argue that the chancellor should have ordered the City to indemnify them because they were guilty of passive negligence, while the City was guilty of active negligence. The chancellor found that the Lake Owner Defendants and ELA were guilty of active negligence in the maintenance of the dam, spillway, and culvert system. This finding was not manifestly erroneous. The chancellor found that there had been mudjack-ing at the inlet apron. There was evidence that sections of the culvert pipe had *589 been regrouted. This evidence, along with Rogers’s letters concerning maintenance of the lake and spillway and the evidence of cracks at the inlet headwall, provided evidence that the Lake Owner Defendants and ELA actively had maintained the spillway, but that they had done so in a negligent manner that was insufficient to stop water from escaping. Because the chancellor did not err by finding that the Lake Owner Defendants and ELA were actively negligent, the chancellor correctly rejected the indemnity claim.

II. Issues raised by Individual Lake Owner Defendants

A. WHETHER THE CHANCELLOR ERRED IN RULING THAT THE LAKE OWNER DEFENDANTS ARE JOINTLY LIABLE AS INDIVIDUAL PROPERTY OWNERS AND AS MEMBERS OF ELA.
¶ 51. Two individual Lake Owner Defendants, Michael Borne and Honey Holman, have filed a separate brief arguing that the chancellor erred in finding the Lake Owner Defendants liable both in their individual capacities and as members of ELA. They argue the Lake Owner Defendants had no responsibility to repair or maintain the culvert system, because that was the responsibility of ELA. They argue that only ELA could repair or maintain the culvert system, because ELA owned a flowage easement for the “inundation, ownership, control, operation and maintenance of said lake, ... at a water level not exceeding the present maximum spillway height level of said lake for so long as said lake is maintained on said lake site.” They argue that, because a lake owner could take action regarding the lake only as a member of ELA, the chancellor’s imposition of liability on the Lake Owner Defendants essentially pierced ELA’s corporate veil to hold the Lake Owner Defendants liable for ELA’s negligent maintenance.
¶ 52. Carraway and the City argue that this issue is procedurally barred because it was not raised before the chancery court. Borne and Holman respond that they raised the issue in the Lake Owner Defendants’ Motion to Alter or Amend Judgment and Findings. In that motion, they contested the chancellor’s finding that the individual property owners had a duty to repair and maintain the lake, and on joint and several liability. These arguments did not embrace their appellate argument that the order pierced the corporate veil. We do not “consider theories of recovery advanced for the first time on appeal.” Scordino v. Hopeman Bros., Inc., 662 So.2d 640, 646 (Miss.1995). Therefore, this argument is procedurally barred. Notwithstanding the procedural bar, this argument fails. The chancellor imposed liability on the Lake Owner Defendants based upon their ownership of an easement by necessity in the culvert system, not based upon their membership in ELA.

III. Issues raised by ELA

B. WHETHER THE CHANCELLOR ERRED BY APPLYING PRINCIPLES OF RIPARIAN LAW TO ELA.
¶ 53. The chancellor found that the Lake Owner Defendants and ELA had a duty of reasonable care in maintaining and repairing the lake and culvert system. The riparian law relied upon by the chancellor holds that an upper landowner is liable for water that flows onto lower lands when he has, by artificial means, discharged the water in a manner that unreasonably damages a lower landowner. Martin v. Flanagan, 818 So.2d 1124, 1126 (Miss.2002). ELA argues that, because it owns no land, the riparian *590 rights principles cited by the chancellor were inapplicable, and that it has no duty of reasonable care in maintaining and repairing the lake and culvert system.
¶ 54. The chancellor found that ELA owned a flowage easement “for the inundation, ownership, control, operation and maintenance” of the lake that was conveyed by the 1978 deed that “expressly reserved, conveyed, and quitclaimed” that easement to ELA. Additionally, the chancellor found that ELA had an easement by necessity along the culvert system that drains the lake. Because ELA owns a right to manage and control the water that overflows from the lake onto downstream properties, the chancellor correctly applied riparian principles to find that ELA has a duty of reasonable care in the management and control of the water.
C. WHETHER THE CHANCELLOR ERRED BY FINDING ELA HAD AN EASEMENT BY NECESSITY BECAUSE ELA OWNS NO LAND.
¶ 55. ELA next challenges the chancellor’s finding that it had an easement by necessity. ELA argues that, because it owns no land to which the easement could be appurtenant, there could be no easement by necessity. ELA argues that easements by necessity are always appurtenant to a dominant estate and that the dominant estate must be comprised of land.
¶ 56. Black’s Law Dictionary defines an “estate” as “the amount, degree, nature, and quality of a person’s interest in land or other property.” Black’s Law Dictionary 567 (7th ed.1999). An “estate” need not be land itself, but may be an interest in land. Id. An easement is an interest in land. Logan v. McGee, 320 So.2d 792, 792-93 (Miss.1975) (stating that “generally, an easement is an interest in the land in and over which it is to be enjoyed”). Eastover Development, Inc., expressly reserved, conveyed, and quit-claimed a flowage easement to ELA. The flowage easement is for “the inundation, ownership, control, operation and maintenance of said lake ... at a water level not exceeding the present maximum spillway height level of said lake.... ”
¶ 57. “[A]n easement may be created or reserved by an implied grant when its existence is necessary to the enjoyment of that which is expressly granted or reserved, upon the principle that where one grants any thing to another he thereby grants him the means of enjoying it whether expressed or not.” Gulf, M. & O.R. Co. v. Tallahatchie Drainage Dist. of Union County, 218 Miss. 583, 594, 67 So.2d 528, 533 (1953) (quoting Lanier v. Booth, 50 Miss. 410 (1874)). As found by the chancellor, drainage of the lake is necessary to ELA’s exercise of the flowage easement so that the lake level is maintained. Drainage is accomplished by the culvert system. Because the culvert system is necessary to ELA’s enjoyment of its flowage easement, the chancellor did not manifestly err in finding that ELA has an implied easement in the culvert system.
D. WHETHER THE CHANCELLOR ERRONEOUSLY BASED ELA’S LIABILITY UPON ELA’S CORRESPONDENCE WITH ITS MEMBERS.
¶ 58. ELA takes issue with the chancellor’s finding that ELA had acknowledged its rights, duties, and potential liabilities concerning the dam, spillway, and culvert system in a series of letters from Steve Rogers, the former president of ELA, to its members. The chancellor cited a January 8, 2002, letter in which Rogers stated “[i]n order to keep the lake clean, well maintained, pest free and protect us from *591 unforeseen liabilities, we need to take certain actions each year. Specifically, we need to clean the lake, repair the dam and spillway, and remove (kill) beavers periodically.” The chancellor cited a June 11, 2004, letter in which Rogers stated “[w]e continue to monitor the lake level to determine if we have a sub-surface leak at the spillway. Sylvia Carraway has a good bit of damage in her backyard from the lake overflow that appears to have spilled from a pipe break.” Also, the chancellor quoted an October 6, 2004, letter in which Rogers stated “the next time you walk by the dam look at the large cracks in the asphalt/concrete spillway. We may have to repair this next summer but in the meantime we will monitor the cracks, leaks, and the water level.” The chancellor found these letters showed an acknowledgment by ELA and the Lake Owner Defendants of their responsibility to repair and maintain the lake, dam, and culvert system.
¶ 59. ELA argues that these communications “could not create liability separate and beyond a proper application of the doctrines of riparian law or imposition of an easement by necessity on the defendants that actually owned upper lands or held estates that were dominant to the Carraway property.” ELA mischaracter-izes the chancellor’s opinion. The chancellor did not base the finding of liability on the letters. Rather, the chancellor found from the letters that the Lake Owner Defendants and ELA knew they had a duty to maintain and repair the culvert system.
E. WHETHER COMMON LAW DUTIES OF CONTRACTORS ARE APPLICABLE TO EAST-OVER LAKE ASSOCIATION SINCE IT DID NOT PERFORM THE WORK ON THE CULVERT SYSTEM PIPE.
¶ 60. ELA takes issue with the following statement in the chancellor’s opinion:
Developers, contractors and companies that help maintain and repair Eastover Lake also have a duty. Contractors or workers performing site work also fall into this category. Therefore, the Lake Owner Defendants, Defendant Eastover Lake Association and those who performed the work, all have a duty of reasonable care owed to the Plaintiffs.
ELA argues that this finding was error because it had not undertaken any maintenance or repair work on the drainage pipe. However, the chancellor found that mud-jacking had occurred at the inlet apron, and there was evidence that sections of the culvert pipe near the inlet had been regr-outed. From this evidence it reasonably may be inferred that the work was performed by the owners of record title and associated easements, who are the Lake Owner Defendants and ELA, or by their predecessors. Further, this ground for the finding of a duty of care in maintaining the culvert system was not a central basis of the chancellor’s holding that ELA and the Lake Owner Defendants owed such a duty. We find that ELA is entitled to no relief concerning this issue.

IV. Issues raised by the City

F. WHETHER THE CHANCELLOR ERRED BY IMPOSING LIABILITY ON THE CITY AFTER DENYING THE INDEMNITY CLAIMS AGAINST THE CITY.
¶ 61. The City argues that the third-party indemnity claims were the sole claims against it pending before the chancellor. The chancellor denied the indemnity claims. The City contends that the chancellor erred by finding the City liable for forty percent of the repair costs, because, after the denial of the indemnity claims, no avenue for relief was available *592 against it. However, the indemnity claims were not the sole claims for relief pending against the City. The ELA and Lake Owner Defendants also included a prayer for general relief in their third-party complaint, asking for “any relief as this court may deem appropriate.”
¶ 62. “Under the general prayer, any relief will be granted which the original complaint justifies and which is established by the main facts of the case, so long as the relief granted “will not cause surprise or prejudice to the defendant/” V.A. Griffith, Miss. Chancery Practice § 186 (2000) (citations omitted). The third-party complaint sought judgment against the City for “all or part of any sums adjudged against [the] defendants.” The prayer for general relief was sufficient to put the City on notice that other relief could be granted besides an all-or-nothing indemnity claim.
¶ 63. Courts of equity have great discretion to grant equitable relief. “[I]t is axiomatic that the relief need not be limited in kind or amount by the demand but may include relief not requested in the complaint.” Pilgrim Rest Missionary Baptist Church By and Through Bd. of Deacons v. Wallace, 835 So.2d 67, 75 (Miss.2003). This reasoning applies to third-party claims as well. M.R.C.P. 54 cmt. (“Rule 54(c) applies to any demand for relief, ... [including a] third party claim.”). Impleader must be used to claim “some form of derivative or secondary liability of the third-party defendant to the third-party plaintiff.” Griffith, Miss. Chancery Practice § 375(a) (2000).
¶ 64. The ELA and Lake Owner Defendants brought a third-party claim against the City claiming derivative liability for all or part of any amounts that might be adjudged against them. They included a prayer for general relief. The prayer for general relief put the City on notice that the chancellor could grant any relief “which the original complaint justifie[d] and which [was] established by the main facts of the case.” Griffith, Miss. Chancery Practice § 186 (2000). The original complaint sought injunctive relief ordering the defendants to repair the culvert and sinkhole, and the issue of liability was fully litigated. The chancery court looked at the facts before it and determined that the City was negligent in its repair of the culvert and responsible for forty percent of the remediation costs, while the ELA and Lake Owner Defendants were responsible for sixty percent. Although an all-or-nothing indemnity claim was properly denied due to negligence on the part of the Lake Owner Defendants, an apportionment of the remediation costs was established by the main facts of the case and the findings of the chancellor, which were that the City, ELA, and the Lake Owner Defendants all were contributorily negligent in the care and maintenance of the culvert system. This judgment did not cause surprise or prejudice to the City, since all of the facts considered by the court were fully litigated and the prayer for general relief in the third-party complaint asked for any relief the court deemed appropriate.
¶ 65. Because “a court of chancery may so shape its decrees as to effect justice between the parties,” and relief may be granted which is justified by the original complaint and the facts presented, the chancery court’s assignment of liability to the City did not go beyond the scope of the pleadings when those pleadings included a prayer for general relief.

CONCLUSION

¶ 66. We affirm in part. This Court holds that, according to the chancellor’s findings, the complaint was filed within the three-year statute of limitations. The City did not accept the culvert system by plat or effect a taking of the culvert system. *593 The chancellor’s order was not impossible to perform. The chancellor did not manifestly err by denying the indemnity claims. The issue raised by Borne and Holman is procedurally barred. The chancellor correctly applied the law in finding that ELA had an easement by necessity along the culvert system and an attendant duty of maintenance and repair. The chancellor did not err in assigning liability to the City after dismissing the indemnity action against the City, since the prayer for general relief in the defendants’ third-party complaint put the City on notice that the chancellor could order whatever equitable relief, if any, that she deemed necessary, so long as it was supported by credible evidence.
¶ 67. Because the chancellor erred in ordering joint and several liability, we reverse and render judgment, apportioning the liability for the costs of the repairs to the culvert system and the replacement of the soil and vegetation which was eroded due to the failure of the culvert system severally among the individual tortfeasors in direct proportion to the percentage of fault assigned to each by the Hinds County Chancery Court.
¶ 68. AFFIRMED IN PART; REVERSED IN PART AND RENDERED.
WALLER, C.J., CHANDLER, PIERCE AND KING, JJ., CONCUR. RANDOLPH, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. LAMAR, J., CONCURS IN PART AND IN RESULT WITHOUT SEPARATE WRITTEN OPINION. DICKINSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY COLEMAN, J. COLEMAN, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY DICKINSON, P.J.

. T.L. Carraway Jr. passed away after filing this lawsuit, and the Estate of T.L. Carraway Jr. (the Estate) and the Thomas L. Carraway Jr. Living Trust (the Trust) (collectively, "Carraway”) were substituted as plaintiffs. T.L. Carraway Jr.’s widow, Sylvia Carraway, is coexecutor of the Estate and a cotrustee of the Trust, and she has a life estate in the property.

. ELA is comprised of most, but not all, of the owners of property abutting the lake.

. Testimony was presented that water enters the lake by means of rainfall, by a series of creeks, tributaries, and storm drains that carry surface water from surrounding properties, and also by direct surface-water runoff from the properties directly surrounding the lake. Without the culvert system, the lake would overflow and flood the street and surrounding properties.

. T.L. Carraway purchased Lot 19 in 1984.

. Testimony was presented that the lake and culvert system drained water from approximately two hundred acres into the Pearl River. The trial court found that, because the “all others” whose property is drained by the culvert system do not own, control, operate or maintain the lake and culvert system, they were not implicated by this case.

. No evidence was presented that the City ever maintained or repaired the culvert. The City's only work on the culvert was to remove and reinstall it in the 2002 city sewer-line repair.

. The third-parly complaints of the Lees, the Lotts, and ELA claim indemnity but do not contain a takings argument.

. The deed conveyed the lake, along with the "spillway, dam, dam site and any related easements therefor” as follows:
Unto the owners of each of the lots ... abutting said lake, the fee simple title thereto, as an integral part of and as an inseparable addition to each of said abutting lots by extending the present boundary lines of said abutting lots to the center line of the perpetual ditch easement in said lake, subject to the easements and other matters hereinafter described.
Unto the aforesaid lot owners and all others having (a Natural easement for the flow of surface waters) there is expressly dedicated and reserved a perpetual ditch easement in said lake.
Unto Eastover Lake Association, Incorporated, ... there is hereby expressly reserved, conveyed, and quitclaimed a flowage easement for the inundation, ownership, control, operation and maintenance of said lake ... at a water level not exceeding the present maximum spillway height level of said lake for so long as said lake is maintained on said lake site....