IRVING, P.J.,
for the Court:
¶ 1. Tim Hoover filed a complaint against George Wayne Callen (George) and Nelta Jean Callen (Nelta Jean) in the *830 Warren County Chancery Court, claiming that he acquired a portion of the Callens’ property through adverse possession or, alternatively, that he is entitled to an easement by necessity on their property. The chancery court denied both of Hoover’s claims. Feeling aggrieved, Hoover appeals and argues that the chancellor erred in determining that he did not adversely possess the disputed property and in not granting him an easement by necessity.
¶ 2. Finding no error, we affirm.
FACTS
¶ 3. The Callens are the owners of a parcel of land that adjoins the eastern and southern borders of Hoover’s land. Hoover claims that he has lived on his property with his family since the 1970s.[1] He testified that he and his brother Mayo built a fence in 1973 or 1974, which they considered the boundary line between their property and the Callens’ property. He further testified that, twelve to fifteen years prior to the trial of this matter, he was present when Mayo installed a field line for a waste disposal septic system. The field line extended from the southern portion of the Hoovers’ land onto the Cal-lens’ land, allowing sewage from the Hoovers’ property to run underground onto the Callens’ property. Hoover claims that he never discussed the field line with George, and George never made a complaint to him regarding the field line. However, without consulting Hoover, George dug up the portion of the field line that was on the Callens’ property. According to George, who testified after Hoover, Hoover sought to purchase that portion of the Callens’ property that contained the field line, but George refused to sell it. Hoover admits that around the time George dug up the field line, George also constructed a fence that “cut through [Hoover’s] yard” and “tore out” the fence that Hoover and Mayo had constructed, excluding Hoover from the pasture in question where the field line ran.
¶ 4. Hoover claims that before George built the fence, Hoover cut the grass and kept trailers and a “four-wheel drive” in the pasture in question. He further claims that he has had continuous use of the pasture since 1973 and has never asked the Callens for permission to use the pasture because it was his property.
¶ 5. George testified that he and his wife, Nelta Jean, moved onto their property in 1974. At that time, Mayo lived on the property that Hoover lives on currently. George testified that after Mayo moved onto that property, there was trouble with Mayo’s septic system, and Mayo asked George if Mayo could install a field line that would extend onto the Callens’ property. George claimed that he gave Mayo permission to lay the field line, and that he and Mayo verbally agreed in the early 1980s that if there were any problems with the field line being on the Cal-lens’ property, Mayo would fix or remove it. George also claimed that problems arose with the field line when Hoover moved onto Mayo’s property after Mayo died. George stated that he went to Hoover and asked him what he was going to do to remedy the problem with the system. Hoover got angry and told George to get off of his property. After Hoover did not do anything to fix the field line, George dug up the field line and placed it on *831 Hoover’s property. Also, around 2008, George erected a fence on the property line separating Hoover’s property and the Callens’ property. He denied that Mayo constructed a fence on the Callens’ property in the 1970s or any other time.
¶ 6. George testified that he constructed a fence for his horses in 2002, but the fence was not constructed on the property line separating the Callens’ property from Hoover’s property. Rather, the fence was constructed within the boundaries of the Callens’ property, and George would mow the grass from the outside of the fence up to the property line. George stated that Hoover asked for permission to put several items in the pasture, including horse trailers and cattle panels. George granted him permission to put those items there. George further stated that Hoover had a truck in the pasture at one point, but did not have permission to put the truck on the property. At George’s request, Hoover removed the horse trailer and cattle panels from the pasture, but refused to. move his truck, even after the police asked him to do so. George stated that he had Hoover’s truck towed and placed on Hoover’s property.
¶ 7. Bobby Carpenter, a civil and environmental engineer expert, testified that he visited Hoover’s property at least five times. He testified that the underground field line that was running on the Callens’ property appeared to be “backed up” and “ponding” because “it wasn’t enough field line to — and soil area to allow [the sewage] to soak in the soil the way it should.” Carpenter opined that there was not enough room in the backyard area of Hoover’s property alone for an underground system. He recommended a chamber system that costs approximately $5,000, which could be put solely on Hoover’s property. He also recommended a drip system, even though it was more expensive at $15,000 and was high maintenance.
¶ 8. Ann Hogue, a district supervising environmentalist for Mississippi, testified that, based on the soil samples that were collected on the Callens’ property, the pasture in question is not suitable for a field line for a septic system, and that the health department would not approve of an underground septic line in that area. She stated that a drip-irrigation system, which starts at about $8,000, would most likely fit on Hoover’s lot.
¶ 9. John Callen (John), George’s brother, testified that he had lived adjacent to George since 1978. He stated that there had never been a fence between Hoover’s and the Callens’ properties until the Callens built a horse fence. To John’s knowledge and observation, Hoover never exercised control and dominion over the pasture in question. David Wrigley testified that he baled hay for the Callens from approximately 1979 to 1990. He stated that there was never a fence on the Hoovers’ property.
¶ 10. Nelta Jean testified that the horse fence was built in 2002 to restrain their horses and was not intended to serve as a property line between their property and Hoover’s property. She stated that she wanted the fence far enough away from the property line so that her husband would have enough room to cut and bush hog outside of the fence without getting on Hoover’s property. She further testified that there were property markers along the property line that George had placed there when the Callens first moved on the property. Nelta Jean showed the “property markers” to the person who erected the horse fence so that they could measure how much room to leave between the property line and the horse fence. She stated that after the conflict arising from the septic system, someone removed the prop *832 erty markers, but the Callens had a survey done to re-establish the property boundaries.[2] Once the property line was reestablished, George removed the horse fence and constructed a new fence along the property line. Nelta Jean testified that prior to the construction of the fences, Mayo had asked if he could put a line from his septic tank on their property because the one he had was not sufficient and was “bubbling up.” The Callens granted him permission.
¶ 11. Nelta Jean stated that Hoover would always ask George if he could put equipment or other items in the pasture in question. She stated that she also spoke with Hoover on the phone, and he asked permission to enter the pasture and “do so and so with some of my stuff.” After the Callens granted Hoover permission to utilize the pasture, he put horse trailers, a large culvert, cattle panels, hay rings, and horses in the pasture. The problems did not start until Hoover parked his truck on the Callens’ property in 2008 without permission.
¶ 12. Additional facts, as necessary, will be related in the analysis and discussion of the issues.
ANALYSIS AND DISCUSSION OF THE ISSUES
¶ 13. Hoover claims that as a result of his actions and his brother Mayo’s actions, he adversely possessed the pasture in question. He also claims that the prohibitive costs of constructing a waste-water system that will fit solely on his property, “coupled with Callen’s destruction of the existing drainage pipe on the property[,] meet[ ] the standard of reasonable necessity required for granting an easement by necessity.”
¶ 14. As stated, the chancellor denied Hoover’s claims that he had adversely possessed the portion of the Callens’ property upon which the field line was installed or, in the alternative, that he was entitled to an easement by necessity. We will not disturb the chancery court’s factual findings unless they are manifestly wrong or clearly erroneous. Double J Farmlands, Inc. v. Paradise Baptist Church, 999 So.2d 826, 829 (¶ 13) (Miss.2008).

I. Adverse Possession

¶ 15. “To acquire property by adverse possession, a claimant must show that [his] possession of the property was: (1) open, notorious, and visible; (2) hostile; (3) under claim of ownership; (4) exclusive; (5) peaceful; and (6) continuous and uninterrupted for a period of ten years.” Id. at (¶ 14) (citing Biddix v. McConnell, 911 So.2d 468, 475 (¶18) (Miss.2005)). “The chancellor must find that the plaintiff[ ] proved each element of [his] claim by clear and convincing evidence.” Roberts v. Young’s Creek Inv., Inc., 118 So.3d 665, 669 (¶ 7) (Miss.Ct.App.2013) (citing Blackburn v. Wong, 904 So.2d 134, 136 (¶ 16) (Miss.2004)). “The adverse possessor must also possess the property without permission, because permission defeats any claim of adverse possession.” Id. at 670 (¶ 10) (citing Apperson v. White, 950 So.2d 1113, 1118 (¶ 12) (Miss.Ct.App.2007)).
¶ 16. Hoover claims that he has met each element of adverse possession and that the adverse possession began when Mayo “started using the [pasture]” after Mayo and Hoover constructed the fence in the 1970s and installed the field line that “allow[ed] waste water from his sewer system to flow across the [pasture] *833 and beyond.” The chancellor found that although Hoover had placed personal property on the pasture in question and Mayo had installed the field line running through the pasture, Hoover had permissive use of the pasture and failed to prove by clear and convincing evidence that he had adversely possessed the pasture. We agree.
¶ 17. Both George and Nelta Jean testified that Hoover sought permission to place personal property in the pasture, and that they granted him permission to do so. Additionally, George testified that Mayo sought permission to place the field line on the Callens’ property. Not only did George grant Mayo permission to do so, George testified that the two of them had an agreement that if anything were to go wrong with the field line, Mayo would remove it or have it repaired. When problems arose and Hoover refused to remedy the problem, George dug up the line. There is ample evidence supporting the chancellor’s findings. Therefore, the chancellor’s findings are not manifestly wrong or clearly erroneous. Because permissive use invalidates any claim of adverse possession, we need not examine the other elements of adverse possession. Thus, this issue is without merit.

II. Easement by Necessity

¶ 18. Hoover claims that a reasonable necessity exists for his sewage system to extend beyond the borders of his property onto the Callens’ adjoining property and that “[t]he cost to value ratio for the installation of [an alternative] system is prohibitive.” “An easement by necessity requires proof that (1) the easement is necessary; (2) the dominant and servient estates were once part of a commonly owned parcel; [and] (3) the implicit right-of-way arose at the time of severance from the common owner.” Borne v. Estate of Carraway, 118 So.3d 571, 584 (¶ 34) (Miss.2013) (citing Leaf River Forest Prods., Inc. v. Rowell, 819 So.2d 1281, 1284 (¶ 10) (Miss.Ct.App.2002)). “An easement by necessity arises by implied grant when a part of a commonly-owned tract of land is severed in such a way that either portion of the property has been rendered inaccessible except by passing over the other portion or by trespassing on the lands of another.” Id. (quoting Taylor v. Hays, 551 So.2d 906, 908 (Miss.1989)). “In determining what is reasonably necessary, the court looks to whether an alternative would involve disproportionate expense and inconvenience.” Burns v. Haynes, 913 So.2d 424, 430-31 (¶ 28) (Miss.Ct.App.2005) (quoting Fourth Davis Island Land Co. v. Parker, 469 So.2d 516, 521 (Miss.1985)). If the land would be valueless without the easement, then the easement is necessary. Id.
¶ 19. The chancellor determined that a “wastewater treatment system of some sort could be placed [solely] on Hoover’s lot.” The chancellor also found that because there was no evidence as to the value of Hoover’s property, there was no indication that the expense of installation would exceed the entire value of either property in question. The chancellor concluded that the evidence was “insufficient to prove that an easement by necessity was reasonably necessary in order to control the untreated wastewater.” However, land-roll receipts for the Hoover property were entered into evidence and indicated that the value of the property ranged from $7,560 to $9,440 between the years 2000 and 2008.
¶20. Nevertheless, the chancellor did not err in denying Hoover an easement by necessity, as the field line does not meet all three requirements for an easement by necessity. Although the parties agree that Hoover’s land and the Callens’ land was *834 once one common parcel, the field line was not installed until the 1990s, long after the parcel had been severed, as the record indicates that the parcels were separate as early as 1973. The “implicit right-of-way” for the septic-system field line did not arise at the time of severance from the common owner. Thus, the chancellor did not err in denying Hoover an easement by necessity.
¶ 21. THE JUDGMENT OF THE WARREN COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, ROBERTS, CARLTON, MAXWELL AND FAIR, JJ., CONCUR. JAMES, J., NOT PARTICIPATING.

. Hoover’s sister Neda Gretzinger testified that Mayo Hoover (Mayo), their brother, bought the property in 1973 and lived there until he passed away in 2001. Mayo’s will left the property to their mother Josephine Hoover (Josephine), who had lived on the property with Mayo until he died and continued to live there until she died in 2002. Josephine's will left the property to Hoover.

. John Barnes conducted the survey on the Callens’ property in 2009 and testified that the horse fence George had built was not constructed on the existing property lines.