# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2019-IA-01835-SCT

*WALTER COOLEY AND TAMMY COOLEY*

*v.*

*PINE BELT OIL CO., INC.*

| | |
|---|---|
| DATE OF JUDGMENT: | 11/22/2019 |
| TRIAL JUDGE: | HON. ROBERT B. HELFRICH |
| TRIAL COURT ATTORNEYS: | JAMES K. DUKES |
| | WALTER H. BOONE |
| | DEBORAH DEROCHE KUCHLER |
| | JOSEPH HENRY HART, IV |
| | JOHN ALEXANDER BRUNINI |
| | BRIAN CRAIG KIMBALL |
| | HALEY FOWLER GREGORY |
| | MONIQUE M. WEINER |
| | M. CHRISTINE CROCKETT WHITE |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | WALTER H. BOONE |
| | ANDY LOWRY |
| | M. CHRISTINE CROCKETT WHITE |
| ATTORNEYS FOR APPELLEE: | MONIQUE M. WEINER |
| | JAMES K. DUKES |
| | DEBORAH DEROCHE KUCHLER |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | REVERSED AND RENDERED - 03/03/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**KITCHENS, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     This interlocutory appeal concerns whether the statute of limitations bars an action for

implied indemnity. The action stems from damages that Pine Belt Oil Co. (Pine Belt)

incurred for the remediation of a September 2008 gasoline leak that originated on property

Walter and Tammy Cooley (the Cooleys) had sold to Pine Belt four months prior to discovery

of the leak. In 2009, the Mississippi Department of Environmental Quality (MDEQ) issued

an administrative order demanding that Pine Belt, the owners of Pine Belt, Robert Allen

Morgan and Melissa Forte Morgan (collectively, "the Morgans"), and the Cooleys pay

remediation costs, including future costs, for the properties afflicted by the gasoline leak.

Since October 2008, Pine Belt has maintained that the Cooleys were responsible for the

gasoline leak, not Pine Belt. After initially refusing to pay the remediation costs, Pine Belt

did begin paying them in July 2009.

¶2.     In April 2016, six years and nine months after its first remediation payment, Pine Belt

filed a complaint seeking indemnification from the Cooleys for Pine Belt's past and future

expenses incurred due to its remediation damage caused by the gasoline leak. The Cooleys

moved for summary judgment, arguing that the claim was barred by the statute of limitations.

The trial judge denied the summary judgment motion.

¶3.     The Cooleys filed a petition for interlocutory appeal, which this Court granted. They

argue that the statute of limitations bars Pine Belt's implied indemnity claim. The Cooleys

argue alternatively that, if the statute of limitations does not bar Pine Belt's implied

indemnity claim, then the claim fails because Pine Belt cannot prove that it did not actively

participate in the underlying wrong, *i.e.*, the gasoline leak. Pine Belt argues that its claim is

not time barred because an action for implied indemnity cannot accrue before a liable party

can be identified and because there must be a final, fixed amount. We hold that the applicable

2

three-year statute of limitations ran on Pine Belt's claim on March 5, 2012. Pine Belt's claim is time barred, and all other arguments are moot.

## STATEMENT OF THE FACTS

¶4.     This dispute involves a parcel of land in Forrest County, Mississippi. Sunrise Trading Post, a gasoline service station and convenience store, is located on the property. The property has been used for gasoline sales since the 1920s. In the late 1980s to the early 1990s, according to MDEQ's records, Pine Belt registered and paid for two underground gasoline storage tanks (USTs) on the property, which were removed from the property on April 24, 1992, while Pine Belt still owned them. The property was sold in February 1995 to James Mark Riley, who later installed several above-ground fuel storage tanks (ASTs). On June 25, 2002, Riley sold the property to Walter and Tammy Cooley. Two months later, on August 13, 2002, the Cooleys conveyed ownership of the property, including the building and the AST system, to Sunrise Trading Post, LLC, a company created by the Cooleys. On May 21, 2008, the Cooleys sold Sunrise Trading Post to the Morgans, who own Pine Belt. The parties described the sale as "a handshake deal" because there was no written contract or indemnity agreement between the Morgans and the Cooleys.[1]

¶5.     On September 6, 2008, gasoline was discovered leaching into a nearby landowner's pond. The release was reported to MDEQ, which visited the property and informed Pine Belt there had been a release of free gasoline product. Two days later, MDEQ requested that Pine Belt perform a precision tightness test (PTT) in order to test the fuel lines of Pine Belt's

---

[1] At oral argument, the Cooleys' attorney explained that there was a deed and that it had been recorded. But neither party included a copy of the deed in the record.

ASTs. In October 2008, MDEQ visited the property to verify that Pine Belt had performed the PTT test and witnessed Pine Belt's performance of a different test on the fuel lines, an air-line test. The fuel lines failed the air-line test, which indicated that there was a leak in the lines. After the test failure, MDEQ requested that Pine Belt stop usage of the fuel lines until repairs could be made and the release of gasoline was remedied. On October 21, 2008, MDEQ sent a letter to Pine Belt confirming that a release of gasoline had occurred at the property and requesting that Pine Belt perform an investigation and assess the property. The next day, October 22, 2008, Pine Belt sent the Cooleys a letter, stating the following:

> At the time Pine Belt Oil Company purchased the property, it did not know, nor did you reveal to them, that the underground piping at the location was presently leaking or had leaked at any time in the past. . . . During an investigation of the scene, it was determined by Pine Belt Oil Company that if the fuel contaminating the property of the adjoining owner came from the Sunrise Trading Post, the fuel was produced prior to the time of Pine Belt Oil Company's purchase of the gas station. Therefore, I request that you contact [an MDEQ employee with a listed telephone number] and make arrangements with the Department of Environmental Quality to comply with their requests for testing and clean-up. I would ask for you to please keep me informed of your progress on this matter and your work with the Department of Environmental Quality.

Pine Belt also forwarded the MDEQ letter of October 21, 2008, to the Cooleys. A Pine Belt representative averred in his deposition that, in 2008, Pine Belt knew that the fuel leak occurred before Pine Belt had acquired the property because sampling had indicated that a component of the leaked fuel was "MTBE,[2] and MTBE had been out of the fuel system

---

[2] In its complaint, Pine Belt avers that "MTBE [methyl tert-butyl ether] is a gasoline additive that fulfilled some of the same functions as tetra ethyl lead—typically referred to as 'lead' or 'ethyl'—after leaded gasoline began to be phased out and was ultimately banned for use in road vehicles, well over a decade before Pine Belt purchased the subject property."

long before we got there."

¶6. On November 19, 2008, Pine Belt met with MDEQ to discuss the release of gasoline. At that meeting, Pine Belt informed MDEQ that it did not intend to remediate damage caused by the release of gasoline. Pine Belt contended that it was not responsible for the remediation efforts. On November 24, 2008, a second meeting between MDEQ and Pine Belt occurred in which Pine Belt again declined to remediate the gasoline damage. The record shows that on December 1, 2008, MDEQ, along with the United States Environmental Protection Agency (EPA), hired a contractor to begin remediation efforts to contain and prevent the release of gasoline.[3]

¶7. On March 5, 2009, MDEQ issued an administrative order to Pine Belt, the Morgans, and the Cooleys. In its order, MDEQ ordered the parties to "immediately contain and remove the free product from the groundwater at the site and any properties that have been polluted"

---

[3] The record includes the Cooleys' expert's report, which says that

[a]n interceptor recovery trench was installed on an adjoining property, owned by Mr. Earl Nordan, on December 12, 2008. A contractor, United States Environmental Services, LLC (USES), removed free phase gasoline and gasoline-contaminated groundwater from the trench at a two-week interval for approximately five (5) months. A free phase gasoline delineation assessment was performed by Neel-Schaffer in December 2008 by drilling twenty (20) borings and installing ten (10) permanent groundwater monitoring wells. The final report of the investigation was completed on January 30, 2009 which indicated 'a free phase gasoline plume approximately 300 feet in length, 100 feet in width and up to five feet in thickness.' An additional groundwater assessment was completed by Neel-Schaffer which included the installation of 55 additional soil borings between December 22, 2008 and February 11, 2009. A report for the assessment was issued on April 22, 2009 titled, 'Free Phase Gasoline Delineation and Miscible Phase Benzene and Methyl-Tert-Butyl Ether [MTBE] Groundwater Assessment.'

and that they were "responsible for any future containment and free product removal from the groundwater at the site and all properties affected[.]" The order cited Mississippi Code Section 49-17-43, which imposes strict liability upon an owner or operator of a facility that causes "pollution necessitating immediate remedial or clean-up action . . . ." Miss. Code Ann. § 49-17-43(4) (Rev. 2012). The order provided that "[c]ontinuing remediation will be necessary for the foreseeable future and Respondents must meet their statutory responsibility to remediate this site . . . ."

¶8.    In a letter to MDEQ dated May 7, 2009, Pine Belt's lawyer wrote, *inter alia*, the following:

> We did not receive the report prepared by Neel Schaffer until on or about April 29th, and after analyzing the same, I am now able to outline the position of Pine Belt Oil and make a proposal as to their willingness to assist in the clean up, although the evidence clearly indicates that Pine Belt Oil has little or no liability or responsibility. On behalf of Pine Belt Oil [and the Morgans], I wish to outline the proposal of Pine Belt Oil and the Morgans, as well as set forth the basis for the position of Pine Belt Oil, and its willingness to voluntarily participate in the remediation procedure, and submit the following to wit:
> Based on the report . . . prepared by Mr. John Malanchak, RPG of Neel-Schaffer, . . . we concur with Mr. Malanchak's opinion concerning the urgency of the remediation of free phase gasoline and gasoline vapors in the immediate vicinity of the store and even though the factual date of the above referenced report concerning the fuel indicates Pine Belt Oil Company, Inc. had virtually no participation in the release of fuel, and Pine Belt Oil Company, Inc. has no liability in and accepts no responsibility for the release. Pine Belt Oil Company, Inc., in a demonstration of goodwill and concern for the safety of the customers and employees of Sunrise Trading Post, proposes the following. . . . Pine Belt Oil Company proposes to begin the remediation of the free phase gasoline and gasoline vapors in the area immediately surrounding the store[.] . . . Pine Belt Oil Company, Inc. will . . . oversee the remediation project of the aforementioned area. Pine Belt Oil Company, Inc. will begin the aforementioned remediation as quickly as is logistically possible. . . . Additionally, the evidence contained in the above referenced report prepared by Neel-Schaffer concerning the components of the fuel, such

6

as lead and MTBE, proves beyond any doubt that the contamination of the area north and west of Sunrise Road occurred at a time when there was absolutely no possible involvement by Pine Belt Oil Company, Inc. during the brief period of time Pine Belt Oil Company, Inc. was associated with the facility and current AST's. It is important to note that Mr. Malanchak does identify the source of the leaded contamination as former UST's[.] . . . Pine Belt Oil Company, Inc., via this letter, formally notifies the [MDEQ] that Pine Belt Oil Company, Inc. is in no way responsible for the remediation of the area north and west of Sunrise Road. Remediation of the area . . . is exclusively the responsibility of the previous owners and operators of Sunrise Trading Post.[4]

The record establishes that Pine Belt hired Neel-Schaffer to conduct the necessary remediation work. The record includes invoices from Neel-Schaffer to Pine Belt beginning in July 2009.

¶9. In 2015, Pine Belt retained William Benni as an expert to identify the exact time that the gasoline was released by conducting a source release timing modeling report. Benni's report was based on sampling data taken over the years since the gasoline release was discovered in September 2008. In his report, Benni concluded that, based on the distribution of methyl tert-butyl, the gasoline leak had occurred in June 2005, when the Cooleys owned the property.

¶10. The Cooleys' expert, Steven Utroska, a professional geologist,[5] opined in his report:

---

[4] While the letter alludes to Pine Belt's "willingness and voluntariness" to participate in remediation efforts, the 2009 MDEQ order placed a legal obligation upon Pine Belt. Additionally, Pine Belt never has contended seriously that the remediation payments it made were voluntary. Nor has Pine Belt contended that the MDEQ order did not create a legal obligation. Both parties agree that the MDEQ order imposed a legal obligation upon Pine Belt. Regardless of this letter's insinuations that Pine Belt acted voluntarily, Pine Belt was under a legal obligation to pay for the remediation efforts.

[5] Each party filed a motion to exclude the other's expert. But the trial court has yet to rule on those motions due to a stay in the proceedings pending the outcome of this interlocutory appeal.

The Property has a long complex history of releases of contaminants to the environment. It is my opinion, based on the facts relied upon, that there is evidence to clearly identify long term and potentially continual releases of contaminants prior to and after the ownership and operation of The Property by [the Cooleys]. In particular, some of the contamination may have occurred during Pine Belt Oil Company's ownership of the USTs. The resulting intermixed contaminant plume and subsequent remedial action, in my opinion, cannot be precisely attributed to any single owner or operator.

¶11. On April 15, 2016, Pine Belt filed an action for implied indemnity against the Cooleys in the Circuit Court of Forrest County. In its complaint, Pine Belt claimed that it "[had] incurred expenses involved in complying with the MDEQ's Order" since March 5, 2009. Additionally, Pine Belt asserted that it was required to comply with the MDEQ order because it was the current landowner and that it "had no active or passive negligence in causing the contamination at issue[.]" Pine Belt asserted also that the Cooleys "are indebted to Pine Belt for expenses [it] has paid to comply with the MDEQ's Order" and that they "are indebted and owe indemnification to Pine Belt for any future expenses [it] incurs to comply with the MDEQ's Order[.]"

¶12. On August 25, 2016, the Cooleys filed a motion for judgment on the pleadings pursuant to Rule 12(c) of the Mississippi Rules of Civil Procedure, asserting that Pine Belt's "implied indemnity claim accrued well over three years ago and [was] barred by the statute of limitations." Pine Belt opposed the motion, arguing:

[The Cooleys] are correct in their assertion that "[t]he statute of limitations accrues when the act occurs which gives rise to the claim" but they misconstrue the "act[s]" that give rise to Pine Belt's claims for indemnity. . . . Each occasion when the MDEQ required Pine Belt to perform and/or pay for some task is a discrete basis for seeking indemnity from the Cooleys. . . . The bases for seeking indemnity from the Cooleys are "continuous" and analogous to a continuing tort for which limitations does not begin to accrue until the acts

8

causing injury cease. Here, the acts creating the bases for indemnity are the ongoing instructions by the MDEQ resulting in expenses being incurred and paid by Pine Belt. . . . Even if it is ultimately found that certain of these discrete instructions occurred more than three years before the filing of Pine Belt's Complaint and are untimely, those discrete instructions by the MDEQ that have forced Pine Belt to incur expenses within the three years immediately prior to the filing of Pine Belt's Complaint remain subject to a claim for indemnity.

After a hearing, the trial court denied the Cooleys' Rule 12(c) motion on March 29, 2017.[6]

¶13.   On October 17, 2019, the Cooleys filed a motion for summary judgment, alleging that Pine Belt's indemnity claim was barred by the statute of limitations. Specifically, the Cooleys alleged that:

1)    "The record demonstrates that Pine Belt's right to sue, if it ever had such a right, became vested in 2009 when the MDEQ Order was issued, or, at the latest, when Pine Belt first began incurring expenses related to the remediation of the Sunrise Trading Post property, also in 2009."

2)    "Notwithstanding, Pine Belt has not met the necessary prerequisites under Mississippi law to invoke implied indemnity, which include a showing (1) that the damages it seeks to shift to the Coolyes [sic] were imposed upon it as a result of some legal obligation and (2) that the Cooleys were actively negligent while Pine Belt was not."

¶14.   In response, Pine Belt argued that its implied indemnity claim was not barred by the statute of limitations because it did not have an enforceable cause of action until it knew whom to sue. Specifically, it argued that "[a] cause of action cannot come into existence before a potentially liable person can be identified." Pine Belt claimed that it "could not identify to a *reasonable* certainty who the property owner was when the release at issue took

---

[6] The Cooleys sought an interlocutory appeal from this Court regarding the denial of this motion on April 18, 2017. On June 14, 2017, a panel of former Chief Justice Waller and Justices King and Chamberlin denied the Cooleys' petition.

place without scientific expertise in analyzing sub-surface petroleum product migration." (Emphasis added.) Therefore, according to Pine Belt, "under the first section of Miss. Code Ann. § 15-1-49, the cause of action accrued when Pine Belt obtained [its expert's] analysis identifying a time frame for the release that could be correlated with a property owner who could be sued for Pine Belt's damages[,]" which was in 2015. Pine Belt argued again that "[e]ach occasion when the MDEQ required [it] to perform and/or pay for some task is a discrete basis for seeking indemnity from the Cooleys" and "[a]t the very minimum, Pine Belt's damages incurred in the three years prior to filing suit are viable[.]" Also, Pine Belt claimed that it had provided "sufficient proof on each of the required elements" for implied indemnity.

¶15. A hearing was held on November 22, 2019. After each party presented its arguments, the trial judge issued his ruling from the bench:

> Based on *J.B. Hunt Transport*[, *Inc. v. Forrest General Hospital*, 34 So. 3d 1171 (Miss. 2010), ] and *Borne* [*v. Estate of*] *Carraway*[, 118 So. 3d 571 (Miss. 2013)], when the statute of limitations began to run and whether Pine Belt actively participated in the release that required the remediation are questions for the jury. So I'm going to deny your motion for summary judgment.

The same day, the trial judge filed a written order denying summary judgment "for the reasons stated from the bench in open court at the hearing of the motion."

¶16. On December 13, 2019, the Cooleys filed a petition for interlocutory appeal, which was granted by this Court. The Cooleys argue that the statute of limitations began to run "when Pine Belt knew it had suffered an injury—that its property had an underground fuel leak that had seeped into neighboring land, and that the State would require Pine Belt to

expend money to remediate the leak." Pine Belt argues that "[a] common-law indemnity cause of action cannot come into existence before a potentially liable person can be identified" and "until the underlying liability 'has become finally fixed and ascertained.'" The Cooleys argue also that neither of the two prerequisites for implied indemnity set forth in *J.B. Hunt* "demand[s] that the plaintiff identify with any certainty what entity supposedly owes him indemnity. The plaintiff (Pine Belt) just has to know that it was not at fault itself."

¶17. Additionally, the Cooleys assert that if the statute of limitations has not run, Pine Belt's claim still fails because Pine Belt voluntarily paid the remediation costs and Pine Belt cannot prove that it was not an active participant in causing the gasoline leak. In response, Pine Belt asserts that these are questions of fact that are reserved for the jury.

**STANDARD OF REVIEW**

¶18. "This Court employs a *de novo* standard of review when considering a trial court's grant or denial of summary judgment." *Hobson v. Chase Home Fin., LLC*, 179 So. 3d 1026, 1033 (Miss. 2015) (citing *WW, Inc. v. Rainbow Casino-Vicksburg P'ship, L.P.*, 68 So. 3d 1290, 1292 (Miss. 2011)). "In considering this issue, we must examine all the evidentiary matters before us, including, inter alia, admissions in pleadings, answers to interrogatories, depositions and affidavits." *Webb v. Braswell*, 930 So. 2d 387, 395 (Miss. 2006) (citing *McCullough v. Cook*, 679 So. 2d 627, 630 (Miss. 1996)). "We are to view the evidence in the light most favorable to the party opposing the motion." *Id.* (citing *Stallworth v. Sanford*, 921 So. 2d 340, 341-42 (Miss. 2006)). "The party moving for summary judgment bears the burden of showing that no genuine issue of material fact exists." *Hobson*, 179 So. 3d at 1033

11

(internal quotation marks omitted) (quoting *WW, Inc.*, 68 So. 3d at 1292). "If no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment should be entered in that party's favor." *Webb*, 930 So. 2d at 395 (citing *McCullough*, 679 So. 2d at 630).

¶19.    Additionally, "[t]his Court applies a de novo standard of review to the statute of limitations." *Lincoln Elec. Co. v. McLemore*, 54 So. 3d 833, 835 (Miss. 2010) (citing *Harris v. Darby*, 17 So. 3d 1076, 1078 (Miss. 2009)); *see also* *Burch v. Ill. Cent. R.R. Co.*, 136 So. 3d 1063, 1065 (Miss. 2014) ("The de novo standard also applies to the application of a statute of limitations, which is a question of law." (citing *Sarris v. Smith*, 782 So. 2d 721, 723 (Miss. 2001))).

## DISCUSSION

¶20.    The parties agree that, because there is no prescribed statute of limitations for an implied indemnity action, the applicable statute of limitations is set forth in Mississippi Code Section 15-1-49(1) (Rev. 2019). Section 15-1-49 provides that

> (1)    All actions for which no other period of limitation is prescribed shall be commenced within three (3) years next after the cause of such action accrued, and not after.
>
> (2)    In actions for which no other period of limitation is prescribed and which involve latent injury or disease, the cause of action does not accrue until the plaintiff has discovered, or by reasonable diligence should have discovered, the injury.

Miss. Code Ann. § 15-1-49(1)-(2) (Rev. 2019). "Generally, statutes of limitation begin to run as soon as a cause of action exists." *Greenlee v. Mitchell*, 607 So. 2d 97, 110 (Miss. 1992) (citing *Aultman v. Kelly*, 236 Miss. 1, 5, 109 So. 2d 344, 346 (1959)). Additionally, "[t]his

12

Court has held that a cause of action accrues "'when it comes into existence as an enforceable claim, that is, when the right to sue becomes vested.'"" ***Weathers v. Met. Life Ins. Co.***, 14 So. 3d 688, 692 (Miss. 2009) (emphasis omitted) (quoting ***Bullard v. Guardian Life Ins. Co. of Am.***, 941 So. 2d 812, 815 (Miss. 2006)). "In other words, the statute of limitations 'begins to run when all the elements of a tort, or cause of action, are present.'" ***Id.*** (quoting ***Caves v. Yarbrough***, 991 So. 2d 142, 147 (Miss. 2008)). Therefore, we must determine the elements that are necessary for an implied indemnity right of action to accrue.

¶21.    Pine Belt argues that an implied indemnity action cannot accrue until "a potentially liable person can be identified[.]" But this argument fails because Mississippi Rule of Civil Procedure 9(h) provided Pine Belt a mechanism for assertion of its implied indemnity claim timely, even though it had not definitively identified the liable person and/or entity. *See* Miss. R. Civ. P. 9(h). This Court has explained that

> "The purpose of Rule 9(h) is to provide a mechanism to bring in responsible parties, known, but unidentified, who can only be ascertained through the use of judicial mechanisms such as discovery. It is not designed to allow tardy plaintiffs to sleep on their rights for . . . years, make only one telephone call prior to the running of the statute, and then enjoy the benefits of the rule."

***Wilner v. White***, 929 So. 2d 315, 322 (Miss. 2006) (quoting ***Doe v. Miss. Blood Servs., Inc.***, 704 So. 2d 1016, 1019 (Miss. 1997)). It is apparent from Pine Belt's letters that it knew the Cooleys likely were liable to them as early as October 2008. Had Pine Belt utilized Rule 9(h) to assert its claim with John Does listed as defendants, it could have substituted the Cooleys as named parties after Pine Belt's expert had determined a time frame for the gasoline leak. *See **Wilner***, 929 So. 2d at 322 ("Rule 9(h) pleadings are not considered amendments

13

changing a party against whom a claim is asserted and are allowed under Rule 15(c) to relate back to the date of the original pleading." (citing Miss. R. Civ. P. 15(c))). Pine Belt cannot claim that its action did not accrue until it could positively identify the liable party when it had a good faith belief since 2008 that the Cooleys indeed were responsible parties. Rule 9(h) obviates an argument that an action does not accrue until a responsible party is identified definitively. We note that, based on Pine Belt's letters, it is apparent that its lawyer had enough information in 2009 to form a good faith belief that the Cooleys were liable with respect to Pine Belt's implied indemnity claim.

¶22.    Pine Belt asserts also that its implied indemnity action could not accrue until there was a final, fixed amount of damages. Both parties recognize that this is an unusual claim for indemnity because there is no judgment or settlement with a fixed amount. Rather, there is an administrative agency's order that legally required a party to pay remediation costs—which are neither fixed nor liquidated—for an underlying wrong, *i.e.*, the gasoline leak. Pine Belt's argument relies on the continuing tort doctrine. Specifically, Pine Belt argues that

> Just as this Court has recognized that a tort can be continuing, so also can a claim for implied indemnity continue beyond an initial loss. The actionable component of Pine Belt's indemnity claim—payment of expenses properly attributable to Defendants—continued well into 2015. Each and every such expense is part of a broader indemnity claim that could not accrue until the entire indemnity claim was complete. . . . In the alternative, at the very least, Pine Belt's expenses incurred within three years of filing suit are not barred by limitations. Limitations could not accrue on an indemnity claim for expenses that had not yet been incurred and that could not be ascertained.

Additionally, Pine Belt argues that, "in the analogous context of continuing torts, limitations

14

will not run on a claim that is ongoing" and that "[e]ach and every time Pine Belt was forced to comply with remediation requirements that [the Cooleys] did not undertake, its indemnity action continued to accrue." We find that Pine Belt's comparison to the continuing tort doctrine is inapposite.

¶23. This Court has held that

[W]here a tort involves a continuing or repeated injury, the cause of action accrues at, and limitations begin to run from, the date of the last injury, or when the tortious acts cease. Where the tortious act has been completed, or the tortious acts have ceased, the period of limitations will not be extended on the ground of a continuing wrong.

A "continuing tort" is one inflicted over a period of time; it involves a wrongful conduct that is repeated until desisted, and each day creates a separate cause of action. *A continuing tort sufficient to toll a statute of limitations is occasioned by continual unlawful acts, not by continual ill effects from an original violation.*

*Pierce v. Cook*, 992 So. 2d 612, 619 (Miss. 2008) (alteration in original) (quoting *Stevens v. Lake*, 615 So. 2d 1177, 1183 (Miss. 1993)). "We have held that we will not apply the continuing tort doctrine when harm reverberates from one wrongful act or omission." *Smith v. Franklin Custodian Funds, Inc.*, 726 So. 2d 144, 149 (Miss. 1998) (citing *Stevens*, 615 So. 2d at 1183). The wrongful act that caused Pine Belt's harm and damages was the action or inaction of the landowner whose negligence, whether active or passive, caused the gasoline leak. It is possible that damages incurred due to that landowner's actions or inactions during the time between the origination of the gasoline leak and the repair of the leak might satisfy the continuing tort doctrine, since damages may have resulted from ongoing tortious acts. But we find that the damages for which Pine Belt seeks

indemnification from the Cooleys are continuing ill effects of the action or inaction that caused the leak, not a continuing tortious act such as ongoing leakage. Thus, Pine Belt's argument in this regard is without merit.

¶24.   The Cooleys argue that Pine Belt's cause of action accrued when Pine Belt discovered or "knew it had been injured." They maintain that "[o]nce Pine Belt knew it had incurred an obligation to MDEQ for conduct for which it believed itself blameless, it had to file suit within three years." Pine Belt asserts that the Cooleys "pervasively confuse and conflate the accrual of a cause of action on the one hand—which starts the limitations clock 'ticking,' with the statutory discovery rule for latent injuries on the other—which tolls limitations on an action that would otherwise accrue until injury specifically is discovered." While the parties agree that the date of discovery/latent injury statutory rule does not apply in this case, each relies on case law interpreting and applying that particular rule. *See Borne*, 118 So. 3d at 571; *Caves*, 991 So. 2d 142; *Angle v. Koppers, Inc.*, 42 So. 3d 1 (Miss. 2010); *Owens-Illinois, Inc. v. Edwards*, 573 So. 2d 704 (Miss. 1990); *City of Tupelo v. O'Callaghan*, 208 So. 3d 556 (Miss. 2017). "[T]his Court has held that if a latent injury is *not* present the discovery rule would *not* apply." *PPG Architectural Finishes, Inc. v. Lowery*, 909 So. 2d 47, 50 (Miss. 2005) (citing *Chamberlin v. City of Hernando*, 716 So. 2d 596, 602 (Miss. 1998)). We find that the so-called discovery rule and its case law have no application and bear no analogous relevance to this case.

¶25.   Regarding causes of action for indemnity, this Court has held that

> An obligation to indemnify may arise from a contractual relation, from an
> implied contractual relation, or out of liability imposed by law. When one

16

person is required to pay money which another person in all fairness should pay, then the former may recover indemnity from the latter in the amount which he paid, provided the person making the payment has not conducted himself in a wrongful manner so as to bar his recovery. 42 C.J.S. Indemnity § 20 (1944).

*Bush v. City of Laurel*, 215 So. 2d 256, 259-60 (Miss. 1968). There is no indemnity contract and no indemnity clause within a contract in this case. Thus, Pine Belt's indemnity claim arises from the common law. For implied indemnity cases:

The general rule governing implied indemnity for tort liability is that a joint tort feasor, whose liability is secondary as opposed to primary, or is based upon imputed or passive negligence, as opposed to active negligence . . . may be entitled, upon an equitable consideration, to shift his responsibility to another joint tort feasor. However, where the fault of each is equal in grade and similar in character, the doctrine of implied indemnity is not available since no one should be permitted to base a cause of action on his own wrong. Thus, the determination of whether or not indemnity should be allowed must of necessity depend upon the facts of each case. 41 Am. Jur. 2d Indemnity § 20 (1968); 42 C.J.S. Indemnity § 20 (1944); Werner Contribution and Indemnity In California, 57 Cal. L. Rev. 490, 491 (1969); Davis, Indemnity Between Negligent Tort Feasors: A Proposed Rationale, 37 Lowa L. Rev. 517, 538 (1952); and Leflar, Contribution and Indemnity Between Tortfeasors, 81 U. Pa. L. Rev. 130, 147 (1932).

*Home Ins. Co. of N. Y. v. Atlas Tank Mfg. Co.*, 230 So. 2d 549, 551 (Miss. 1970).

¶26. We have held that:

Two critical prerequisites are generally necessary for the invocation of noncontractual implied indemnity in Mississippi: (1) The damages which the claimant seeks to shift are imposed upon him as a result of some legal obligation to the injured person; and (2) it must appear that the claimant did not actively or affirmatively participate in the wrong.

*J.B. Hunt*, 34 So. 3d at 1173-74 (emphasis omitted) (quoting *Home Ins. Co.*, 230 So. 2d at 551). We have recognized that a claim for common law indemnity does not arise "until there is legal liability to pay a judgment . . . " that should in fairness be paid by another. *Miss.*

17

***Transp. Comm'n v. Jenkins***, 699 So. 2d 597, 599 (Miss. 1997)).

¶27.    American Jurisprudence provides the following guidance from other states' case law on the scenarios that give rise to an indemnity action:

> Generally, a cause of action for implied indemnity does not come into existence until the indemnitee has suffered actual loss through the payment of a judgment or settlement. Accordingly, a fundamental prerequisite to an action for equitable indemnity is an actual monetary loss through the payment of a judgment or settlement.
>
> Generally, a cause of action for common law indemnification accrues at the time a judgment is rendered against the indemnitee for the underlying claim.

41 Am. Jur. 2d *Indemnity* § 26, Westlaw (database updated May 2021) (emphasis added) (footnotes omitted) (citations omitted). Additionally, American Law Reports states, citing case law from other jurisdictions:

> The rule generally recognized in most jurisdictions is that the cause of action for . . . indemnity based upon tort is distinct from the cause of action for the underlying tort, and the time when the statute of limitations starts to run upon such cause of action is not when the tort is committed, but when the underlying claim, a judgment thereon, or a settlement thereof is paid or discharged. . . .
>
> However, frequently statements made by some courts indicate that the statute of limitations might be regarded as commencing to run on a cause of action for indemnity at some time prior to actual payment, namely, *at the time the injured person recovers judgment against the indemnitee or when such judgment becomes final*.

57 A.L.R. 3d 867 (footnotes omitted), Westlaw (emphasis added) (citations omitted).

¶28.    Pine Belt argues that "the trial court correctly ruled that when Pine Belt's cause of action accrued requires resolution of highly disputed questions of fact." We disagree. In its brief, the questions of fa[ct that Pine Belt asserted were: (1) whether Pine Belt was actively negligent; (2) the discovery of the injury, i.e., the source of the contamination; and (3)

18

whether Pine Belt's payment under the 2009 MDEQ order was voluntary. This Court has held that "[o]ccasionally the question of whether the suit is barred by the statute of limitations is a question of fact for the jury; however, as with other putative fact questions, the question may be taken away from the jury if reasonable minds could not differ as to the conclusion." *Smith v. Sanders*, 485 So. 2d 1051, 1053 (Miss. 1986) (citing *Gulfport Fertilizer Co. v. McMurphy*, 114 Miss. 250, 75 So. 113, 114 (1917)); *see also Averitt Express, Inc. v. Collins*, 172 So. 3d 1252, 1255-56 (Miss. Ct. App. 2015) ("If there is no factual dispute, 'the question is one of law, and the Court may independently review those facts to determine the correct answer.'" (quoting *Walls v. N. Miss. Med. Ctr.*, 568 So. 2d 712, 714 (Miss. 1990))).

¶29. Here, reasonable minds could not differ on the question of whether the elements of common law indemnity were present in 2009. *See Weathers*, 14 So. 3d at 692 (quoting *Bullard*, 941 So. 2d at 815). Pine Belt and the Cooleys agree that Pine Belt was under a legal obligation by virtue of the MDEQ order of March 5, 2009, which mandated the parties to pay for the remediation of injury caused by the gasoline leak. It is manifest from the record that as early as 2008, Pine Belt believed that its short time of ownership of the property appeared to show that it was not an active participant in causing the gasoline leak.[7] In 2009, it informed MDEQ that it bore no responsibility for the leak. It asserted that a 2009 expert

---

[7] In *J.B. Hunt*, this Court stated that "*it must appear that the claimant did not actively or affirmatively participate in the wrong*[;]" we interpret that language to mean that, in order for the action to accrue and allow a complaint for implied indemnity to be filed, only a good-faith belief, based on appearances, that the person or entity seeking indemnity was not an active participant in the wrong is required. *J.B. Hunt*, 34 So. 3d at 1174.

19

report by Neel-Schaffer established that Pine Belt was not responsible based on the presence of lead and MTBE in the fuel contamination. We observe that it is apparent from the record that the earliest invoice related to the costs for remediation was for July 1, 2009. Although the amount that Pine Belt was ordered to pay by MDEQ was unliquidated, the MDEQ order legally obligated Pine Belt to pay for present and future cleanup costs which Pine Belt all along believed, in fairness, should be paid by the Cooleys. Because the order placed Pine Belt under a compulsion to pay damages which it believed should be paid by another, this Court finds that all of the elements of implied indemnity were present and the statute of limitations began to run on March 5, 2009, and ended on March 5, 2012. Pine Belt did not file its complaint until April 15, 2016. Thus, Pine Belt's implied indemnity action is time barred. Because the claim is time barred, we do not reach the question of whether Pine Belt can prove the elements of implied indemnity or address the conflicting testimony of the experts.

¶30.　The separate opinion contends that, although MDEQ ordered Pine Belt to pay for present and future cleanup costs on March 5, 2009, MDEQ issued cleanup orders in 2013 and 2014 that created an "unusual" situation necessitating a jury determination of when the limitations period began. CDIP Op. ¶ 51 (emphasis omitted). But what the separate opinion characterizes as orders actually are letters sent by counsel for MDEQ to counsel for Pine Belt concerning specific aspects of Pine Belt's performance of the remediation ordered on March 5, 2009. Those letters did not impose any legal obligations outside the scope of the cleanup required by the March 5, 2009, order. Undoubtedly in recognition of that fact, Pine Belt's complaint for indemnity avers that the source of the liability it incurred on behalf of the

20

Cooleys was the March 5, 2009, order. The 2013 and 2014 letters did not revive Pine Belt's implied indemnity claim. The March 5, 2009, order was the only MDEQ order in this case, and it obligated Pine Belt and the other affected parties to perform "continuing remediation for the foreseeable future."

¶31. Under the separate opinion's viewpoint, every future remediation payment made by Pine Belt pursuant to the original 2009 order would give it three years in which to sue the Cooleys to recover that payment, sparking the potential for almost endless litigation. The separate opinion deems this concern a red herring, yet it does not explain why. The separate opinion's analysis would violate the protections afforded to litigants by the applicable statute of limitations. This Court has held that "[t]he primary purpose of statutory time limitations is to compel the exercise of a right of action within a reasonable time. These statutes are founded upon the general experience of society that valid claims will be promptly pursued and not allowed to remain neglected." *Mitchell v. Progressive Ins. Co.*, 965 So. 2d 679, 683 (Miss. 2007) (internal quotation marks omitted) (citing *Miss. Dep't of Pub. Safety v. Stringer*, 748 So. 2d 662, 665 (Miss. 1999)); *see also* *Wood v. Carpenter*, 101 U.S. 135, 139, 25 L. Ed. 807 (1879) ("[Statutes of limitation] promote repose by giving security and stability to human affairs."). Nor did Pine Belt's acquisition, in 2015, of an expert report providing further MTBE-based evidence that Pine Belt was not responsible revive the claim because, since 2009, Pine Belt had asserted that it was not responsible for the contamination and that it had an expert report proving it was not responsible based on the presence of MTBE. Because the March 5, 2009, MDEQ order compelled all of the payments that Pine Belt has

made or will make, for which it believed all along it was not responsible, all elements of implied indemnity were present when the order was entered.

**CONCLUSION**

¶32.    A cause of action accrues and the statute of limitations begins to run when all the elements of the action are present. Here, all the elements for implied indemnity were satisfied on March 5, 2009, when Pine Belt was ordered to pay cleanup costs for an underlying wrong in which Pine Belt appeared not to have been an active participant. The statute of limitations for an implied indemnity action is three years. Thus, Pine Belt's implied indemnity claim ran on March 5, 2012. Pine Belt did not file its claim until April 15, 2016, which was approximately three years too late. This Court finds that Pine Belt's action for implied indemnity is time barred and that the Cooleys were entitled to summary judgment. All other arguments are moot.

¶33.    **REVERSED AND RENDERED.**

**KING, P.J., BEAM, CHAMBERLIN AND GRIFFIS, JJ., CONCUR. RANDOLPH, C.J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY COLEMAN, MAXWELL AND ISHEE, JJ.**

**RANDOLPH, CHIEF JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶34.    An indemnity claim does not accrue until payment is made. With respect to indemnity claims by Pine Belt arising from payments made *before* April 15, 2013, I concur, because the applicable three-year statute of limitations expired as to those claims. However, those claims accruing from payments made *on or after* April 15, 2013, were not prescriptively time-barred

22

when this action was filed on April 15, 2016. Thus, I respectfully concur in part and dissent in part.

¶35.    Before this Court is an order denying a motion for summary judgment filed by Walter and Tammy Cooley. The trial court properly determined that factual disputes and issues of whether Pine Belt's claims were barred and whether Pine Belt sufficiently alleged the elements of its claims are questions of fact, depending on the evidence presented.

¶36.    "[I]ndemnify" is defined as "[reimbursement] for a *loss* suffered because of a third party's or one's own act or default." *Indemnify*, Black's Law Dictionary (11th ed. 2019) (emphasis added). Likewise, "indemnification" is defined as "the action of compensating for *loss* or damage *sustained* . . . the compensation so made." *Indemnification*, Black's Law Dictionary (11th ed. 2019) (emphasis added). Indemnification claims come into being at the moment a payment has been made. In other words, a party must suffer a loss by payment to another to trigger an indemnification claim.

¶37.    This case is not premised on a claim that the Cooleys are liable in tort. Thus, neither the discovery rule nor the continuing-tort doctrine have application to this case. Pine Belt seeks recovery of payments made due to demands of the Mississippi Department of Environmental Quality (MDEQ). The losses incurred by Pine Belt were imposed because of strict liability.[8] Pine Belt seeks to be indemnified, *inter alia,* for losses it incurred for

---

[8] Pine Belt's duty to pay was not based upon fault or negligence, but strict liability. The 2009 MDEQ order cited Mississippi Code Section 49-17-43 which states, in pertinent part, that "[a]ny person who *owns or operates* facilities which, through misadventure, happenstance *or* otherwise, cause pollution necessitating immediate remedial or clean up action shall be liable for the cost of such remedial or clean-up action . . . . Miss. Code. Ann. § 49-17-43(4) (Rev. 2012) (emphasis added); *see also* 33 U.S.C. §§ 1251-1388 (the Clean

remediation of a site that contained methyl tert-butyl ether (MBTE). There is no dispute that contamination emanated from property sold by the Cooleys to Pine Belt. The question presented to this Court is whether the trial court properly denied the Cooleys' motion for summary judgment. The Cooleys' motion contends that *all* claims of indemnification, regardless of when the claim or payment was made, are barred by a three-year statute of limitations. Pine Belt rebutted, arguing that it was not until 2015 "[d]uring an investigation of the scene, it was determined by Pine Belt Oil Company that if the fuel contaminating the property of the adjoining owner came from the Sunrise Trading Post, the fuel was produced prior to the time of Pine Belt Oil Company's purchase of the gas station." While its argument may or may not be true, that is a decision for the fact finders, not summary dismissal by an appellate court.

¶38.    It is well settled that "[a]n obligation to indemnify may arise from a contractual relation, from an implied contractual relation, or out of liability imposed by law." ***Bush v. City of Laurel***, 215 So. 2d 256, 259 (Miss. 1968). There is no disagreement that the three-year statute of limitations found in Mississippi Code Section 15-1-49 applies. It provides that claims shall barred "within three (3) years next after the cause of such action accrued, and not after." Miss. Code Ann. § 15-1-49(1) (Rev. 2019). It is also well settled that "a cause of action 'accrues' when it comes into existence as an enforceable claim, that is, when the right to sue becomes vested." ***Bullard v. Guardian Life Ins. Co. of Am.***, 941 So. 2d 812, 815 (Miss. 2006) (internal quotation marks omitted) (quoting ***Forman v. Miss. Publishers Corp.***,

---

Water Act).

195 Miss. 90, 14 So. 2d 344, 346 (1943)). In a recent case, this Court held that

> Two critical prerequisites are generally necessary for the invocation of noncontractual implied indemnity in Mississippi: (1) The *damages* which the claimant seeks to shift are imposed upon him as a result of some legal obligation to the injured person; and (2) *it must appear that the claimant did not actively or affirmatively participate in the wrong.*[9]

*J.B. Hunt Transp., Inc. v. Forrest Gen. Hosp.*, 34 So. 3d 1171, 1173–74 (Miss. 2010) (first

emphasis added) (quoting *Home Ins. Co. v. Atlas Tank Mfg. Co.*, 230 So. 2d 549, 551

(Miss. 1970)). Thus, damages must not have only been claimed but must have been paid.

Furthermore, the one seeking indemnification must not have participated in the wrong that

caused the injury. Each element is fact-intensive.

¶39.    The trial court recognized numerous factual questions precluded summary judgment

as a matter of law.

¶40.    The following dates and facts are crucial in evaluating the trial court's denial of

summary judgment.

**FACTS**

¶41.    On June 25, 2002, the Cooleys bought the property. On May 21, 2008, Pine Belt

purchased the Cooleys' property. On September 6, 2008, gasoline was found leaching into

an adjacent landowner's pond. On September 8, 2008, MDEQ requested Pine Belt perform

tests on its fuel lines. In October 2008, those tests revealed a leak. On October 21, 2008,

MDEQ also corresponded with Pine Belt and requested an investigation be conducted. On

October 22, 2008, MDEQ corresponded with the Cooleys and requested that the Cooleys

---

[9] That is a fact that the majority summarily imposes against Pine Belt, despite their protestation through expert testimony.

25

comply with testing and clean-up.

¶42.    On March 5, 2009, MDEQ issued an administrative order to Pine Belt *and* the Cooleys, *inter alia*, ordering them to clean up the site and informing them that they would be responsible for any future clean up. In July 2009, only Pine Belt complied.

¶43.    The first MDEQ order mandated that the both parties "immediately contain and remove the free product from the groundwater at the site and any properties that have been polluted" and provided they were "responsible for any future containment and free product removal from the groundwater at the site and all properties affected[.]"  The order further stated that "[t]he failure to comply with this [o]rder will be considered a continuing violation of those laws and regulations, subjecting the Respondents to further penalties of up to $25,000 per day."  The second MDEQ order in 2013 required that the dual-phase extraction system paid for by Pine Belt continue to be operated; and that two wells from the property across the street (a different location) be added to the maps created by the Neel-Schaffer engineers, at Pine Belt's expense, to be included in the reports provided to MDEQ. The third MDEQ order in 2014 mandated that two more monitoring wells be added to the sampling roster, as they were needed for dissolved phase plume delineation.[10]  *MDEQ also added the requirement of statistical analysis and interpretation of each impacted well, previously neither sought nor performed by anyone.*  Pine Belt complied with these governmental demands subsequently, incurring more than $1 million of additional expenses. At every point, Pine Belt was subject to the compulsory governmental demands of MDEQ. Its resulting

_____

[10] A plume is an underground pattern of contaminant. Delineation is mapping and defining that pattern through sampling.

payments were in response to the attending legal obligation.

¶44.   Of particular import, it was not until the 2014 Order that MDEQ required additional testing which resulted in the identification of the MTBE.   Within six months of gaining knowledge of this fact, Pine Belt averred that it was not responsible for the remediation of the MBTE contamination because that chemical was removed from gasoline decades prior. The Cooleys contest this fact. Again, the Cooleys may prevail, but neither the trial judge nor a single justice on this Court has such uncontested knowledge. In evaluating a motion for summary judgment, courts analyze in the light most favorable to the nonmoving party. If the facts are in dispute, trial is necessary to decide the contested facts.

¶45.   In October 2015, William Benni, an expert hired by Pine Belt, identified MTBE contaminant in the sampling data. Benni concluded that the distribution of the entire plume, which was similar in composition, indicated that one major release of contamination occurred, as opposed to a "kind of dripping, ongoing release." Moreover, the Cooleys admitted that fuel had gone missing during their ownership. No tests were performed, so no leak was revealed. These are just a sampling of the numerous facts to be considered and resolved by a jury.

¶46.   On April 15, 2016, Pine Belt filed this action seeking indemnification for expenses incurred and paid by Pine Belt to contain or remove the contamination and for all future expenses to contain and remove contamination from the subject and surrounding properties. In the complaint, Pine Belt alleged that MTBE was identified in the remediation ordered by MDEQ. Benni determined a plume from the contamination was the result of a single, major

27

release prior to Pine Belt's ownership. Pine Belt further alleges that gasoline additive was phased out of gasoline and ultimately banned for use in road vehicles more than a decade before Pine Belt purchased the Cooleys' property. Thus, Pine Belt pleads that it did not contribute to the MTBE contamination. Pine Belt avers that its indemnification claim related to MTBE contamination did not arise until after 2015. Pine Belt avers it did not actively or affirmatively participate in the wrong and that it should not be held responsible for the MTBE contamination. Once again, a fact finder must sort this out.

¶47. On August 25, 2016, the Cooleys filed a Mississippi Rule of Civil Procedure 12(c) motion, arguing that Pine Belt's claims were barred by the three-year statute of limitation. The Cooleys argued that Pine Belt knew about remediation expenses since the first MDEQ Order was issued on March 5, 2009. At the hearing, Pine Belt argued that it did not know until 2015 that the source of contaminants included MTBE, qualifying it to seek recovery for those remediation costs, alleging that they had not affirmatively participated in the release of product containing MTBE. On March 29, 2017, the trial court correctly denied the Cooleys' Rule 12(c) motion, finding that the Cooleys failed to establish that there was no set of facts that would support Pine Belt's claims.

¶48. On October 17, 2019, one month after discovery was completed and one week before trial, the Cooleys filed a motion for summary judgment, again alleging Pine Belt's claims were barred by the three-year statute of limitations. At that hearing, Pine Belt argued that this case did not concern toxic torts or latent injuries, as the Cooleys represented, and that it did not discover the MTBE contamination until 2015.

28

¶49. On November 22, 2019, the trial court correctly followed our existing law and denied the motion for summary judgment, finding that the issues presented, whether Pine Belt was an active participant and whether the statute of limitations had expired, were questions of fact for the jury.

## ANALYSIS

¶50. No judgment or settlement with a fixed amount is at issue here. Multiple, ongoing compliance requirements were issued that separately and legally obligated Pine Belt to pay for remediation costs. In addition to the original 2009 order, MDEQ continued to mandate Pine Belt's compliance. In this case, no single judgment, event, or claim exists. Pine Belt's monetary losses were created by separate events and payments.

¶51. Pine Belt argues that "those discrete instructions by the MDEQ that have forced Pine Belt to incur expenses within the three years immediately prior to the filing of [its] Complaint remain subject to a claim for indemnity." Such claims are not null as a matter of law at this stage of the proceedings; the *unusual* nature of this *claim for indemnity* creates "a question of fact for the jury" as to "whether the suit is barred by the statute of limitations . . . ." ***Smith v. Sanders***, 485 So. 2d 1051, 1053 (Miss. 1986) (citing ***Gulfport Fertilizer Co. v. McMurphy***, 114 Miss. 250, 75 So. 113, 114 (1917)); *see* Maj. Op. ¶ 28.

¶52. ***J.B. Hunt*** set forth two requirements for invoking an implied indemnity action—"(1) the damages which the claimant seeks to shift are imposed upon him as a result of some legal obligation to the injured person; and (2) it must appear that the claimant did not actively or affirmatively participate in the wrong." ***J.B. Hunt****,* 34 So. 3d. at 1174 (emphasis omitted).

29

Thus, the viability of any particular indemnity claim is not effectuated until damages have accrued as a result of an order. Here, damages were imposed upon Pine Belt via MDEQ orders in 2013 and 2014 (at which time, according to the majority, the statute of limitations had already run). Even when utilizing the *J.B. Hunt* standard, additional imposition of damages creates a separate claim of indemnity.

¶53.   With respect to (2), this factor undeniably implicates genuine issues of material fact. To whom shall factual disputes appear? It must *appear* to the jury that the claimant did not participate in the wrong. The majority detailed the relevant ownership history of the subject property and also pointed out that there are competing expert opinions (also for a jury to sort out) on who owned the property at the time of the gasoline leak. Maj. Op. ¶¶ 4, 9-10. The date of the release of the petrochemicals that migrated to adjoining property is a disputed fact at this point, as is whether and when subsequent damages ensued. At the summary judgment stage of these proceedings, in which "the non-moving party should be given the benefit of every reasonable doubt," *Moss v. Batesville Casket Co.*, 935 So. 2d 393, 398 (Miss. 2006) (citing *Tucker v. Hinds Cnty.*, 558 So. 2d 869, 872 (Miss. 1990)), the trial judge's determination is without error that "whether Pine Belt actively participated in the release that required the remediation is a question for the jury."

¶54.   The majority's expressed concern of "endless litigation" is a red herring. Maj. Op. ¶ 31. Once sufficient remediations have been implemented, the allowable time period to indemnify comes to an end. "The primary purpose of statutory time limitations is to compel the exercise of right of action within a reasonable time." *Mitchell v. Progressive Ins. Co.*,

965 So. 2d 679, 683 (Miss. 2007) (internal quotation mark omitted) (quoting *Miss. Dep't of Pub. Safety v. Stringer*, 748 So. 2d 662, 666 (Miss. 1999)). An allowance of three years to recover the payments from 2013 and 2014 is not only reasonable; the law demands it. We agree that Pine Belt cannot require the Cooleys to fund the 2009 remediation efforts, for that demand exceeds the three-year window provided by law. Yet nothing in our law mandates that Pine Belt should be penalized for first suffering damages after the statute of limitations had expired.

**COLEMAN, MAXWELL AND ISHEE, JJ., JOIN THIS OPINION.**